**Mark G.A. WELSH, a minor, and Elliott A. Welsh, his father and next friend, Plaintiffs,**

v.

**BOY SCOUTS OF AMERICA and Boy Scouts of America West Suburban Council # 147, Defendants.**

**No. 90 C 1671.**

United States District Court, N.D. Illinois, E.D.

March 13, 1992.

See also 742 F.Supp. 1413.

Richard David Grossman, Dannen, Crane, Heyman & Simon, Chicago, Ill., for plaintiffs.

Thomas D. Allen, Thomas E. Patterson, Wildman, Harrold, Allen & Dixon, Chicago, Ill., George A. Davidson, James A. Kobak, Jr., Carla A. Kerr, Hughes, Hubbard & Reed, New York City, for defendants.

## MEMORANDUM OPINION AND ORDER

ILANA DIAMOND ROVNER, District Judge.

### I. INTRODUCTION

This case comes before the Court after trial and on the parties' post-trial proposed findings of fact and memoranda of law. The issue posed is whether the Boy Scouts of America properly may exclude from membership persons who are unwilling to profess a belief in and duty to a supreme being under Title II of the Civil Rights Act of 1964, which prohibits places of public accommodation from discriminating on the basis of religion. Upon review of the statute and consideration of the evidence presented at trial, the Court concludes that the Boy Scouts of America does not qualify as a "place of public accommodation" within the reach of Title II. Accordingly, the Court enters final judgment in favor of the defendants on both counts of the amended complaint.

### II. BACKGROUND

Plaintiffs Mark G.A. Welsh and his father, Elliott A. Welsh, have sued the Boy Scouts of America ("BSA") and the Boy Scouts of America West Suburban Council No. 147 (the "Council")—collectively, the "Boy Scouts"—under Title II of the Civil Rights Act of 1964, 42 U.S.C. § 2000a *et seq.* ("Title II"). The Boy Scouts has refused to admit Mark into its "Tiger Cub" and "Cub Scout" programs because Mark is unwilling to subscribe to a duty to God. Plaintiffs maintain that the Boy Scouts constitutes a place of public accommodation under Title II because its emphasis upon recreational and fun activity renders it a "place of entertainment" within the scope of the statute; if true, the organization cannot discriminate on the basis of religion and exclude atheists and agnostics. Plaintiffs' complaint asks the Court to enter an injunction barring BSA from excluding individuals who do not believe in a supreme being and requiring the Council to admit Mark Welsh as a youth member and his father as his adult partner. The Boy

Scouts argues that (1) it does not qualify as a "place of public accommodation" within the coverage of Title II; (2) that even if Title II does apply, the Boy Scouts falls within the private club exemption to the statute's strictures; and (3) that requiring the Boy Scouts to admit individuals unwilling to profess a belief in God would infringe upon the rights of intimate and expressive association which its members enjoy under the First Amendment.

Defendants moved to dismiss the complaint at the outset of the litigation, raising each of the arguments set forth above. The Court denied that motion in a memorandum opinion dated August 9, 1990. *Welsh v. Boy Scouts of America,* 742 F.Supp. 1413 (N.D.Ill.1990) (Rovner, J.). In that opinion, the Court rejected the Boy Scouts' argument that it could not, as a matter of law, be deemed a "place of public accommodation" within the scope of Title II. 742 F.Supp. at 1421, 1423.[1] The Court also declined to find, as a matter of law, that the Boy Scouts involves relationships so personal that the forced admission of atheist or agnostic individuals pursuant to Title II would violate the First Amendment right of intimate association. *Id.* at 1430. Similarly, the Court declined to rule as a matter of law that the admission of such individuals would interfere with the First Amendment right of expressive association or the right to free exercise of religion. *Id.* at 1435, 1436. The Court reiterated in the conclusion of its opinion that the Boy Scouts' defenses implicated questions of fact which could not be resolved on the complaint alone. *Id.* at 1436.

After the parties completed their discovery, plaintiffs moved for summary judgment or, in the alternative, for partial summary judgment finding that they had established a *prima facie* case of cognizable discrimination under Title II. The Boy Scouts did not file its own motion for summary judgment. Essentially, plaintiffs argued that the undisputed facts established the inverse of each of the arguments defendants had raised in seeking dismissal of the

complaint, *i.e.,* that the Boy Scouts was in fact a place of public accommodation, that it did not qualify for the private club exemption to the statute, and that application of Title II to the organization would not impermissibly infringe upon the rights of intimate and expressive association. The Court rejected these arguments as well, concluding that fundamental disputes as to the true nature of the Boy Scouts precluded summary judgment on any aspect of the case:

> [T]his case is to a great extent one about the Boy Scouts' nature, its conduct, its true purposes, and its methods of achieving them. Only in resolving these factual questions can the Court decide the particular issues posed by this suit: Is the Boy Scouts a public accommodation subject to the provisions of Title II? Is it by nature so private that it may be deemed exempt from the statute? Is the nature of the association among its members sufficiently intimate or expressive that the admission of agnostics or atheists would intrude upon the members' First Amendment freedoms? In part, these are legal inquiries guided by a substantial body of case law. *See Welsh,* 742 F.Supp. 1413. At the same time, however, their determination requires a decision as to which evidence to credit—a decision which generally must be reserved for trial. Plaintiffs, for example, rely upon evidence (much of it drawn from Boy Scouts literature) which emphasizes the fun, recreational aspects of the Boy Scouts. Based upon this evidence, they argue that the organization furnishes entertainment and thus qualifies as a public accommodation. Defendants, on the other hand, point to evidence which indicates that the recreational aspects of the Boy Scouts must be viewed simply as a means to an end—the instillment of important social values in male youths. Whose view of the Boy Scouts is correct, and where the organization fits on the spectrum of institu-

---

**1.** The Court also rejected the contention that because Congress had granted a federal charter to the Boy Scouts, it necessarily had sanctioned the exclusion of persons who did not concur in the organization's religious principles. 742 F.Supp. at 1423–24.

tions to which Title II may or may not apply, cannot be resolved upon a cold record. The literature, affidavits, and deposition testimony which the parties have submitted to the Court adequately support their respective views of the Boy Scouts; but only in hearing live testimony, tested by cross-examination, can the Court finally decide whose view to credit. *Welsh v. Boy Scouts of America,* No. 90 C 1671, Mem.Op. at 8–9, 1991 U.S. Dist. LEXIS 5979, 1991 WL 78179 (N.D.Ill. May 3, 1991) (Rovner, J.).

The case proceeded to trial on June 10, 1991, and the Court heard testimony over the course of six days. At the conclusion of the trial, the Court requested the parties to submit revised proposed findings of fact as well as post-trial memoranda. The post-trial briefing was completed on August 23, 1991.

The case is now ripe for final decision from the Court. Having heard and reviewed the evidence presented at trial, having considered the express provisions of Title II, and having carefully reviewed once again the case law applying the federal statute and comparable state provisions, the Court finds the case to be resolved on the threshold question of whether the Boy Scouts constitutes a place of public accommodation as that term is defined in the statute. Based upon the evidence which reveals the Boy Scouts to be a membership organization whose benefits flow primarily, if not exclusively, from the interpersonal associations among its members rather than from a tangible facility or "source of entertainment" which has moved in interstate commerce, the Court concludes that the Boy Scouts does not constitute a "place of entertainment" within the scope of Title II's prohibition of discrimination in places of public accommodation.

**2.** Because the Court's disposition of the case rests upon the threshold question of whether or not the Boy Scouts constitutes a place of public accommodation as defined by Title II, facts to which the parties have stipulated but which the Court finds immaterial to this issue have not been incorporated into the Court's findings.

## III. FACTS

### A. *Stipulated Facts*

The parties have stipulated to a number of background facts regarding the nature of the Boy Scouts and the events and policies which led to this litigation. These are summarized below and, pursuant to the parties' stipulation, the Court includes them among its findings of fact. *See Stephenson v. United States,* 771 F.2d 1105, 1107 (7th Cir.1985).[2]

1. Plaintiff Mark Welsh is the minor child of plaintiff Elliott A. Welsh and Donna Arsenoff. He lives with his parents in Hinsdale, Illinois. At the time this litigation was instituted, Mark was seven years old, was in the first grade, and desired to join a Tiger Cub Group.

2. Elliott Welsh is a resident of Hinsdale, Illinois. At the time this litigation was instituted, Elliott Welsh desired to join a Tiger Cub Group as his son's adult partner.

3. Boy Scouts of America ("BSA") is a congressionally chartered corporation, pursuant to 36 U.S.C. §§ 21–29, offering the Tiger Cub, Cub Scout, Boy Scout and Explorer programs to its membership.

4. The West Suburban Council Boy Scouts of America ("West Suburban Council") is a not-for-profit Illinois corporation, chartered by BSA to make sure that the general principles of advancement are understood and carried out in the local area, to make Scout training available, and to supervise member groups in such a way as to ensure strict adherence to BSA requirements and standards. Pack 56 in Burr Ridge, Illinois is one of the Scouting groups supervised by the West Suburban Council. Hinsdale and Burr Ridge, Illinois are within the jurisdiction of the United

Certain of the stipulated facts have also been reordered by the Court and renumbered accordingly.

In some instances, defendants have stipulated to a particular fact but have contended the fact is irrelevant to the issues posed in the case. To the extent any of these facts have been included in the Court's findings, the relevance objections are overruled.

States District Court for the Northern District of Illinois.

5. BSA is part of the world-wide Scout movement founded by Robert Baden-Powell in England in 1907. The World Organization of the Scout Movement was established in 1922. The World Organization now involves national organizations in approximately 130 countries, including BSA, all of which agree to follow and are governed by the *Constitution and By-laws of the World Organization of the Scout Movement.*

6. The *Constitution and By-Laws of the World Organization of the Scout Movement* sets forth the three principles of duty to God, duty to others, and duty to self to which all members world-wide adhere. The *Constitution* requires all members to adhere to a Scout Promise and Scout Law which reflect these principles.

7. BSA requires as a condition of membership that all applicants recognize a duty to God.

8. Scouting is conducted through Scout packs, troops, and posts.

9. Each pack, troop, post, and local council is self-financed and is governed by the *Constitution and By-laws of the World Organization of the Scout Movement* and the *Rules and Regulations of the Boy Scouts of America.*

10. BSA is a *bona fide* non-profit organization. Its volunteer leaders serve without compensation or material reward of any kind.

11. BSA was incorporated in the District of Columbia in 1910 and published its first Handbook in 1911. The BSA Scout Oath or Promise for Boy Scouts has remained unchanged from that date:

On my honor I will do my best to do my duty to God and my country and to obey the Scout Law, to help other people at all times, to keep myself physically strong, mentally awake and morally straight.

12. BSA's Scout Law provides:

A Scout is: ... Trustworthy.
　　　　　 ... Loyal.
　　　　　 ... Helpful.
　　　　　 ... Friendly.
　　　　　 ... Courteous.
　　　　　 ... Kind.
　　　　　 ... Obedient.
　　　　　 ... Cheerful.
　　　　　 ... Thrifty.
　　　　　 ... Brave.
　　　　　 ... Clean.
　　　　　 ... Reverent.

13. BSA is divided into geographic regions. BSA charters local councils, which are separate not-for-profit corporations, to further Scouting in a given geographic area. Local councils are divided into districts. Districts are overseen by a volunteer committee. The principal duty of each district is to work with sponsoring groups in organizing and supporting packs, troops, and posts. BSA charters sponsoring groups to maintain packs, troops, or posts.

14. Every sponsoring organization appoints one delegate to a local council, which elects an executive board. Each local council has at least three delegates to the National Council. The National Council elects the National Executive Board which sets national policy for BSA. The National Council furthers Scouting nationally.

15. Each council also employs a small number of professional Scouters to advise and guide its volunteers. For example, West Suburban Council employs approximately six professionals for its approximately 1,600 volunteer leaders.

16. The sponsoring group is charged with providing suitable facilities for meetings and activities, adult leaders, and a Chartered Organization Representative who acts as liaison between the sponsoring group and the pack. The adult leaders are all volunteers who register as members of BSA.

17. Cub Scouting was created as an outgrowth of the Boy Scouting program and became a permanent program of BSA in 1930.

18. In order to become a Cub Scout, a boy must meet the following membership requirements. The boy must have complet-

ed first grade or be between the ages of seven and ten years old; he must have the written consent of his parent or guardian; he must register and pay the national registration fee; and he must complete the Cub Scout Application. In completing the Cub Scout Application, the boy signs a pledge which shows he has read the Cub Scout Promise and Law of the Pack and promises to do his best to live up to them. He also promises to attend regularly the meetings of his den and pack.

19. In addition, the parent of a prospective Cub Scout must sign the boy's application, indicating that the parent agrees to help with the boy's advancement, to participate in other den and pack activities, to attend monthly pack meetings, and to assist den and pack leaders.

20. It is the leader's responsibility to teach each boy the Cub Scout ideals, as expressed in the Cub Scout Promise, the Law of the Pack, and the Cub Scout Motto. The Cub Scout Promise reads as follows:

I, (name), promise to do my best
To do my duty to God and my country
To help other people, and
To obey the Law of the Pack.

21. The Law of the Pack reads as follows:

The Cub Scout follows Akela.[3]
The Cub Scout helps the Pack go.
The Pack helps the Cub Scout grow.
The Cub Scout gives goodwill.

22. The Cub Scout motto is "Do Your Best."

23. The Cub Scouting program takes place in three principal venues. The individual Cub Scout conducts many activities at his home with his family; the den, consisting of six to eight boys, generally meets at the home of the adult den leader, usually a parent of one of the boys in the den; and the Cub Scout pack, comprising four to six dens, typically meets in a room provided by the sponsoring organization, such as a church or civic organization.

24. Den meetings are generally held weekly. Pack meetings are held once a month.

25. Some ceremonies often held during den meetings are progress toward ranks ceremonies, Denner Installation ceremonies (recognizing the appointment of new boy leaders), and special recognition ceremonies, which acknowledge special achievements and activities participated in by the boys.

26. A typical pack meeting is attended by the boys in each den and their families, den and pack leaders, and an occasional guest specially invited by the leaders. In order to encourage family attendance, pack meetings are held in the early evening. The Cub Scouts assemble as dens, with their families sitting behind them.

27. The pack meeting typically commences with a ceremony led by the Cubmaster, the principal adult leader of the pack, which ordinarily includes a recitation of the Cub Scout Promise.

28. Most pack meetings feature a recognition period in which Bobcat, Wolf, Bear, and Webelos badges and other symbols of achievement are presented. A formal ceremony, involving the Cub Scout's family, surrounds the presentation of each badge.

29. This recognition period is often followed by a demonstration conducted by the Webelos dens of projects performed or skills acquired during the prior month. Games involving the parents, Cub Scouts, and siblings may also follow.

30. Cub Scouts are encouraged to wear Cub Scout uniforms to meetings of their den and pack. The colors of the Cub Scout uniform have symbolic meaning. The blue stands for truth and spirituality, steadfast loyalty, and the sky above; the gold for warm sunlight, good cheer, and happiness.

31. Most packs hold a Blue and Gold banquet during Scouting anniversary week

---

**3.** "Akela" is the mythical leader of a wolf pack described in "The Story of Akela and Mowgli," which in turn is based upon the story "Mowgli's Brothers" in Rudyard Kipling's *Jungle Book. See Wolf Cub Scout Book* (Defendants' Exhibit No. 7) at 4–10. The term "Akela" is used in Cub Scouting to refer to adult authority figures, including both den leaders and parents. *See id.* at 10–11.

in February. The activities at a Blue and Gold banquet are largely the same as those of a regular pack meeting, although special guests may take part in the program.

32. The Tiger Cubs program is a relatively new BSA program designed for first-grade boys and their adult partners. Tiger Cub Groups, consisting of four to eight boy and adult pairs (or teams), are affiliated with Cub Scout packs, but operate independently under separate programs.

33. The Tiger Cub Promise is:

I promise to love God, my family, and my country, and to learn about the world.

The Tiger Cub motto is: "Search, Discover, Share."

34. The Tiger Cub emblem is symbolic of the program's stress on equal participation.

35. A Tiger Cub Group comprises four to eight Tiger Cubs and their adult partners who meet monthly. A Tiger Cub Group is affiliated with a Cub Scout pack.

36. Tiger Cub groups normally recite the Tiger Cub promise at each meeting.

37. Achievement is not as strongly emphasized at the Tiger Cub level, but the completion of activities can be rewarded by the adult partner's presenting a Tiger Cub sticker to the boy for each activity completed.

38. On or about September 11, 1989, on the premises of Anne Jeans Grade School, plaintiff Mark Welsh was supplied with a flyer. A copy of the flyer is offered as Plaintiffs' Exhibit No. 1 without objection as to authenticity and is incorporated herein by reference. The front page of that flier stated:

**JOIN TIGER CUBS, BSA
AND HAVE LOTS
OF FUN!**

**YOU CAN JOIN TIGER CUBS, BSA,
IF YOU ARE IN
THE FIRST GRADE**

The reverse side of the flyer, directed to parents, stated, *inter alia,* that "[a]ny boy

who is in the first grade (or is 7 years old) may join Tiger Cubs, BSA, with his adult partner," and further that "[a]ny adult 18 years of age or older can work with the boy in Tiger Cubs, BSA. This can be mom, dad, an aunt, uncle, or grandparent, an older brother or sister, or even a neighbor." Finally, the flyer contained an invitation to a special informational meeting sponsored by Pack 56 at the Palisades School in Burr Ridge, Illinois on September 15, 1989.[4]

39. On Friday, September 15, 1989 at 7:00 p.m., plaintiffs Mark Welsh and Elliott Welsh attended a recruiting meeting of prospective members of Pack 56 at the Palisades School in Burr Ridge, Illinois.

40. At that time, plaintiffs learned that the applications to join BSA required the applicants to agree to recognize an obligation to God.

41. Plaintiffs left the meeting without applying, but subsequently Elliott Welsh sent the application and fee directly to the West Suburban Council. A copy of Plaintiffs' application is offered as Plaintiffs' Exhibit No. 2 without objection as to authenticity and is incorporated herein by reference. Plaintiffs refused to subscribe to the Declaration of Religious Principle and any reference to God.

42. The West Suburban Council returned the application and fee to Elliott Welsh, explaining that agreement with the Declaration of Religious Principle is a requirement for admission into a Tiger Cub Group.

43. At the present time, Mark Welsh is eight years old and desires to join a Cub Scout den. He will not be admitted unless he subscribes to the Cub Scout Promise, in which a Cub Scout promises to do his best to do his duty to God.

44. Neither Mark Welsh nor Elliott Welsh believes in God. Mark Welsh is not willing to subscribe to the Cub Scout Promise and Elliott Welsh is not willing to subscribe to the Declaration of Religious Principle.

---

**4.** The foregoing citations to the specific statements and information included in the flyer are the Court's.

45. Elliott Welsh wants his son to be a Cub Scout because of certain non-religious values he recognizes that BSA instills in boys, as well as the "fun" aspects of Scouting.

46. Elliott Welsh believes that if BSA were a sectarian youth group, it would be free to exclude atheists.

47. Parents are always welcome at any Scouting activity, even though they are not actual members of BSA. They do not, however, normally attend den meetings.

48. The families of every Cub Scout are invited to attend pack meetings with the Cub Scout, regardless of whether they are actual members of BSA. Additionally, families, whether members of BSA or not, are invited to a yearly Blue and Gold banquet, which usually takes the place of the February pack meeting.

49. In order to further the purposes of the Scouting movement, BSA sells books, uniforms, badges, camping equipment, and other Scouting materials. These sales are "supply operations."

50. BSA publishes certain guides and other materials. Among the materials published by BSA are the *Cub Scout Leader Book, The Cub Scout Fun Book, Boys Life, A Representative Membership, The BSA Charter and By Laws*, and *BSA Rules and Regulations*.

51. West Suburban Council receives some operating funds from the United Way.

**B.** *Court's Independent Findings of Fact*

1. The Boy Scouts is an educational organization whose central purpose is to foster the development of certain skills and values in male youths. These include citizenship, patriotism, self-reliance, courage, sportsmanship, respect for one's family, the ability to get along with others, involvement in the community, physical fitness, athletic and survival skills, an appreciation for nature, and the acknowledgement of a supreme being.[5]

2. The educational aims of the Boy Scouts are in great measure accomplished through a range of activities which are designed, and are represented to be, recreational and entertaining. As explained in the *Cub Scout Leader Book:*

**Cub Scouting is Fun**

A boy joins Cub Scouting for the fun he expects. Part of that fun is belonging to a den and taking part in exciting, fun-filled activities. Cub Scouting's fun is not exclusively for boys; it's fun for leaders and families, as well. And an interesting thing happens—while the boys are having fun, doing the things they like to do, without realizing it they are also learning new things, developing new skills, gaining self-confidence, and becoming more worthwhile individuals.

*Cub Scout Leader Book* (Plaintiffs' Exhibit No. 4, Defendants' Exhibit No. 6) at 4.[6]

---

5. *See, e.g., Charter and By–Laws of the Boy Scouts of America* (Plaintiffs' Exhibit No. 9, Defendants' Exhibit No. 1) at 6, By–Laws Article I, Section 2; *id* at 17, Article IX, Section 1; *id.* at 18, Article X, Section 1; *Rules and Regulations of the Boy Scouts of America* (Plaintiffs' Exhibit No. 8, Defendants' Exhibit No. 2) at 5, Article X, Section 1, Clause 1; *By–Laws, West Suburban Council, Boy Scouts of America* (Defendants' Exhibit No. 4) at 1, Article II, Section 1; *Constitution and By–Laws of the World Organization of the Scout Movement* (Defendants' Exhibit No. 5) at 3, Article I, Sections 1 and 2.

*See also* Tr. at 58–59 (testimony of Sandra Dixon); Tr. at 79 (testimony of Ben Dixon); Tr. at 100–01 (deposition testimony of William A. McCleery, III); Tr. at 136 (testimony of Boyd Ridley Critz, III); Tr. at 228, 230–31, 231–32 (testimony of Carol C. Rapacz); Tr. at 238 (testi-

mony of Eugene F. "Bud" Reid); Tr. at 249–50, 261 (testimony of Rabbi Peter E. Hyman); Tr. at 345 (testimony of Professor Larry Jensen).

6. *See also, e.g., Cub Scout Leader Book* (Plaintiffs' Exhibit No. 4, Defendants' Exhibit No. 6) at 3 ("The purpose of the Boy Scouts of America ... is to provide for boys and young adults an effective educational program designed to train in the responsibilities of participating citizenship, provide growth in moral strength and character, and to enhance the development of physical, mental, and emotional fitness. Mighty serious business, all done in the spirit of fun."); *id.* at 43–58 (listing suggested activities); *Wolf Cub Scout Book* (Defendants' Exhibit No. 7) (listing activities); *Big Bear Cub Scout Book* (Defendants' Exhibit No. 8) (listing activities); *Boy Scout Handbook* (10th ed. 1990) (Defen-

3. Boys are encouraged to join Tiger Cubs, Cub Scouts, and Boy Scouts, and to a significant extent do join these groups, in order to have fun.[7]

4. The structure of the Boy Scouts emphasizes group activities. Thus, members are organized into groups which range from the smaller dens or patrols to the larger packs or troops. Much, if not most, of what a young man does as a member of the Boy Scouts he does in the context of these groups.[8]

5. The smallest of these groups, the den or patrol, is the focal point of Boy Scout activities.[9] These groups meet most frequently (typically on a weekly basis).[10] For the individual Boy Scout member, the other members of the den or patrol are likely to be the Scouts he will come to know best and with whom he will have the most regular contact.[11] Boys typically attend the

dants' Exhibit No. 10) at 544 ("When you go to a weekly troop meeting, you can expect 90 minutes packed with activities.... There will be plenty of fun and good fellowship, too, in the form of songs, stunts, and ceremonies."); Tiger Cub Flip Chart (Defendants' Exhibit No. 15) at 4 ("Most importantly, the Tiger Cub program enables your boy and you to have fun together, to learn new things together and to grow together."); *id.* at 15 ("The Tiger Cub Family Activity Book is your guide to a year of fun with a purpose."); *Cub Scout Fun Book* (Plaintiffs' Exhibit No. 5) (describing various entertaining activities).

*See also* Tr. at 94, 97, 99, 100–01 (deposition testimony of William A. McCleery, III); Tr. at 134, 135–36, 136–37, 146, 514 (testimony of Boyd Ridley Critz, III); Tr. at 249–50 (testimony of Rabbi Peter E. Hyman); Tr. at 386 (testimony of Professor Ricky L. Slavings).

**7.** *See, e.g., Boy Scout Handbook* (10th ed. 1990) (Defendant's Exhibit No. 10) at ix ("Don't wait a minute longer to get in on all the fun Scouts have."); *id.* at 2 ("Finally, Scouting is fun. You can look around during Scouting activities and notice a smile on every face. Everyone is sharing, learning, and living the Scout life."); *Cub Scout Handbook* (Plaintiffs' Exhibit No. 4, Defendants' Exhibit No. 6) at 3 ("A boy joins Cub Scouting for the fun he expects." and "Cub Scouting helps fulfill a boy's desire for adventure...."); Tiger Cub Flip Chart (Defendants' Exhibit No. 15) at 10 ("Tiger Cubs, BSA, gives you and your boy a year of fun and exciting activities.").

*See also* Tr. at 51, 52 (testimony of Sandra Dixon); Tr. at 68, 70 (testimony of Mark Welsh); Tr. at 72, 79 (testimony of Ben Dixon); Tr. at 94 (deposition testimony of William A. McCleery, III).

**8.** *See, e.g., Rules and Regulations of the Boy Scouts of America* (Plaintiffs' Exhibit No. 8, Defendants' Exhibit No. 2) at 5–6 (describing pack, troop, and post structures); *Constitution and By–Laws of the World Organization of the Scout Movement* (Defendants' Exhibit No. 5) at 5, Article III (listing membership in small groups as one of primary means by which Scout Method's system of progressive self-education is achieved); *Boy Scout Handbook* (10th ed. 1990) (Defendants' Exhibit No. 10) at 535 ("As a member of a patrol, you are no longer alone....

You will be able to achieve much more than you would by yourself." and "A patrol is a team of good friends working together to make things happen."); *id.* at 540 (describing relationship of patrol to troop); Tiger Cub Flip Chart (Defendants' Exhibit No. 15) at 6 ("You and your boy share with each other and with other members of your Tiger Cub group all the great things you have done together."); *id.* at 15 (emphasizing activities with Tiger Cub group); *Webelos Scout Book* (Defendants' Exhibit No. 9) at 18 ("Much of your boy's activity badge work will be done in the den.").

*See also* Tr. at 166 (testimony of Charles E. Rummel); Tr. at 350 (testimony of Rabbi Peter E. Hyman); Tr. at 374–78, 379, 380, 382–84 (testimony of Professor Ricky L. Slavings).

**9.** *See, e.g., Cub Scout Leader Book* (Plaintiffs' Exhibit 4, Defendants' Exhibit No. 6) at 12–13 (describing Cub Scout and Webelos dens and Tiger Cub groups); *Wolf Cub Scout Book* (Defendants' Exhibit No. 7) at 30 ("Cub Scouting is fun, and much of that fun starts in your den."); *Boy Scout Handbook* (10th ed. 1990) (Defendants' Exhibit No. 10) at 535 (describing patrol); *id.* at 540 ("Patrols are such a key part of Scouting that a portion of troop meetings is set aside for each patrol to meet by itself.")

*See also* Tr. at 391–92 (testimony of Professor Ricky L. Slavings).

**10.** *See, e.g., Cub Scout Leader Book* (Plaintiffs' Exhibit 4, Defendants' Exhibit No. 6) at 12, 13, 73, 76; *Wolf Cub Scout Book* (Defendants' Exhibit No. 7) at 30; *Big Bear Cub Scout Book* (Defendants' Exhibit No. 8) at 14; *Webelos Scout Book* (Defendants' Exhibit No. 9) at 14; *Boy Scout Handbook* (10th ed. 1990) (Defendants' Exhibit No. 10) at 540, 544; *Official Scout–Master Handbook* (Defendants' Exhibit No. 73) at 76–77.

*See also* Tr. at 52–53 (testimony of Sandra Dixon); Tr. at 222 (testimony of Carol C. Rapacz); Tr. at 393 (testimony of Professor Ricky L. Slavings); Tr. at 548 (testimony of Gerrold Frumm).

**11.** *See, e.g., Cub Scout Leader Handbook* (Plaintiffs' Exhibit No. 4, Defendants' Exhibit No. 6) at 12 ("The den organization allows boys to get to know each other better...."); *Boy Scout Hand-*

larger pack, troop, or post meetings as dens or patrols.[12]

6. Virtually all Boy Scout activities are group oriented. The activities at weekly Cub Scout den meetings, for example, typically call for group interaction. These might include a rowdy game designed to expend energy, a lesson in how to tie a necktie, a craft activity, a group sing-along of "God Bless My Underwear," or a nature hike.[13] Even the individual attainment of achievement badges, which represents one of the central ways in which the organization's education aims are accomplished, is tied to the group. Work on these achievements is frequently a focus of den meetings.[14] At the same time, individual achievements are reviewed and sometimes reflected on charts displayed at den meetings or beads worn by scouts as part of their uniforms.[15] Awards for such achievements are presented in the larger pack or troop setting.[16]

7. Boy Scout activities frequently make use of items which are sold by the Boy Scouts. These include Boy Scout uniforms, the *Cub Scout Fun Book* and other books describing various activities appropriate for Boy Scout meetings, camping equipment, and other items. These items are sold throughout the United States at local council service centers and Boy Scout-authorized outlets.[17]

8. Elliott Welsh was able to purchase two Boy Scout items, a Tiger Cub T-shirt and a scout leader's cap, through a J.C.

book (10th ed. 1990) (Defendants' Exhibit No. 10) at 535 ("A patrol is a team of good friends...."); *id.* at 540.

See also Tr. at 374, 379, 380 (testimony of Professor Ricky L. Slavings); *and see* Tr. at 58 (testimony of Sandra Dixon) ("It was more fun for my son to see the Planetarium with his five best friends or five good friends than it was just to go with the family.")

12. *See Cub Scout Leader Book* (Plaintiffs' Exhibit No. 4, Defendants' Exhibit No. 6) at 68; *Boy Scout Handbook* (10th ed. 1990) (Defendants' Exhibit No. 10) at 544; *Official Scout–Master Handbook* (Defendants' Exhibit No. 73) at 87.

See Tr. at 383, 392–93 (testimony of Professor Ricky L. Slavings).

13. *See, e.g., Cub Scout Leader Book* (Plaintiffs' Exhibit No. 4, Defendants' Exhibit No. 6) at 26, 74–75; *Boy Scout Handbook* (10th ed. 1990) at 540, 544; *Tiger Cubs, BSA Family Activity Book* (Defendants' Exhibit No. 13) at 3 ¶ 5, 4–5. *See also* activities described in *Wolf Cub Scout Book* (Defendants' Exhibit No. 7); *Big Bear Cub Scout Book* (Defendants' Exhibit No. 8); *Webelos Scout Book* (Defendants' Exhibit No. 9).

See also Tr. at 45–46, 48–51 (testimony of Sandra Dixon); Tr. at 72–73, 76–77 (testimony of Ben Dixon); Tr. at 106–07 (deposition testimony of William A. McCleery, III); Tr. at 135 (testimony of Boyd Ridley Critz, III); Tr. at 220–21, 225–26 (testimony of Carol C. Rapacz); Tr. at 384 (testimony of Professor Ricky L. Slavings); Tr. at 549 (testimony of Gerrold Frumm)

14. *See* Tr. at 45 (testimony of Sandra Dixon); Tr. at 221 (testimony of Carol C. Rapacz).

15. *See* Tr. at 225, 226 (testimony of Carol C. Rapacz).

16. *See Cub Scout Leader Book* (Plaintiffs' Exhibit No. 4, Defendants' Exhibit No. 6) at 72; *Offi-*

cial *Scout–Master Handbook* (Defendants' Exhibit No. 73) at 88.

See also Tr. at 73 (testimony of Ben Dixon); Tr. at 227 (testimony of Carol C. Rapacz).

17. *See* photograph of Cub Scout den meeting in home of Carol Rapacz (Defendants' Exhibit No. 74) showing scouts in uniform; *Boy Scout Handbook* (10th ed. 1990) (Defendants' Exhibit No. 10) at 27 (noting that camping gear available at national Supply Division of Boy Scouts of America); *id.* at 27–28, 36, and 51–53 (picturing various Scout camping equipment); *id.* at 567 ("How to Get a Uniform"); *Webelos Scout Book* (Defendants' Exhibit No. 9) at 24 ("Securing the Uniform"); *Cub Scout & Webelos Scout Program Helps 1991–92* (Defendants' Exhibit No. 64) at Cub 3 Intro 91 and back cover (listing resources available for purchase from Boy Scouts equipment distributors or council service centers, including *Cub Scout Leader How–To Book, Cub Scout Song Book, Cub Scout Sports Leader Guide, Wolf Cub Scout Book, Big Bear Cub Scout Book, Webelos Scout Book, Webelos Den Activities, Cub Scout Fun Book, Cub Scout Magic, Bobcat Action Book, Wolf Action Book, Bear Action Book,* and *Tiger Cub Family Activity Packet* ); *Official Scout–Master Handbook* (Defendants' Exhibit No. 74) at 211, 212, 330 (listing literature, camping equipment, and uniforms available for purchase).

See also Tr. at 45, 49–51 (testimony of Sandra Dixon) (describing use of activities set forth in How–To, Wolf, and Bear books); Tr. at 139–40, 149–50 (testimony of Boyd Ridley Critz, III) (describing items sold by Boy Scouts of America); Tr. at 222, 223–26 (testimony of Carol C. Rapacz) (noting that uniforms were worn at Cub Scout meetings, and describing Defendants' Exhibit No. 74); *id.* at 241 (noting use of den chief book as a resource for songs).

Penney's catalog. These were shipped to Mr. Welsh from a catalog center in Milwaukee, Wisconsin. (Tr. at 29–30.) He was also able to purchase copies of the *Cub Scout Fun Book* and the *Cub Scout Leader Book* from a department store in La-Grange, Illinois. (*Id.* at 29.)

9. In the year ending 1989, the Boy Scouts took in over $13 million from supply operations, which included the sale of such items.[18]

10. Given the large volume of such products which the Boy Scouts sells throughout the country, it is virtually certain that many if not most of these items have moved in interstate commerce. However, with the exception of Elliott Welsh's testimony regarding the purchase of items from the J.C. Penney catalog center in Wisconsin, plaintiffs have not presented any direct evidence on this point.

11. Although these items are used in or foster various activities which are enter-

taining, they are not indispensable to Boy Scout activities.[19]

12. Boy Scout activities do not depend upon or necessarily emanate from particular facilities or locations. Den, patrol, pack, and troop meetings, for example, typically take place at private homes, public schools, and church facilities.[20] Nothing in the nature of the activities which normally occur at such meetings requires a particular kind of location or facility.[21]

## IV. ANALYSIS

The threshold question presented in this case is whether or not an organization like the Boy Scouts, membership in which does not provide access to a particular facility, qualifies as a "place of public accommodation" within the reach of Title II. Accordingly, it is appropriate to begin with the statute itself. *See Ardestani v. I.N.S.,* —— U.S. ——, 112 S.Ct. 515, 519, 116 L.Ed.2d 496 (1991); *United States v. Real Estate*

---

**18.** *See Boy Scouts of America, 1989 Report of the Treasurer and Financial Statements* (Plaintiffs' Exhibit No. 6) at 3.
  *See also* Tr. at 139–41 (testimony of Boyd Ridley Critz, III).

**19.** *See, e.g., Boy Scout Handbook* (1st ed. 1911) (Defendants' Exhibit No. 12) at 46 ("It should be clearly understood by all interested in the Scout Movement that it is not necessary for a boy to have a uniform or any other special equipment to carry out the scout program. There are a great many troops in the country which have made successful progress without any equipment whatever.").
  *See also* Tr. at 238 (testimony of Carol C. Rapacz) (uniforms not required); *id.* at 241 (noting limited use of *Cub Scout Fun Book*); Tr. at 355 (testimony of Professor Larry Jensen) (uniforms not required).

**20.** *See, e.g., Cub Scout Leader Book* (Plaintiffs' Exhibit No. 4, Defendants' Exhibit No. 6) at 68, 73, 76; *Webelos Scout Book* (Defendants' Exhibit No. 9) at 14; *Boy Scout Handbook* (10th ed. 1990) (Defendants' Exhibit No. 10) at 540; *Pack 52 1990–91 Orientation Guide* (Defendants' Exhibit No. 61) at 12.
  *See also* Tr. at 14 (testimony of Sandra Dixon); Tr. at 219 (testimony of Carol C. Rapacz); Tr. at 519 (testimony of Boyd Ridley Critz, III); Tr. at 549 (testimony of Gerrold Frumm).

**21.** *See, e.g., Cub Scout Leader Book* (Plaintiffs' Exhibit No. 4, Defendants' Exhibit No. 6) at 73 ("Most dens meet in the den leader's home. Meetings are usually held in the same room;

however, they can be held in a basement, garage, backyard, or other practical place. Many dens in large cities meet in apartment houses, small parks, or squares nearby. Some dens in rural areas meet in a school classroom because of distances involved in traveling to someone's home."); *Webelos Scout Book* (Defendants' Exhibit No. 9) at 14 ("The Webelos den meets once each week in the evening or on Saturday. The meeting place probably is either the home of the den leader or some central place, perhaps in the chartered organization's building if it has one."); *Boy Scout Handbook* (10th ed. 1990) (Defendants' Exhibit No. 10) at 544 ("Not every troop meeting is held at the same place or at the usual time. Now and then a troop may hold its weekly meeting at a fire station or police headquarters so that you can learn firsthand how your town is protected. Another time you may gather at a local pool and try to pass some of the swimming requirements for a rank or merit badge. Or the troop might go to city hall to see your government in action."); *Boy Scout Handbook* (1st ed. 1911) (Defendants' Exhibit No. 12) at 3 ("All that is needed is the out-of-doors, a group of boys, and a competent leader."); *Scouting Handbook (Relationships between The Church of Jesus Christ of Latter-day Saints and the Boy Scouts of America)* (Defendants' Exhibit No. 52) at 9 ("Patrol meetings could be held at the meetinghouse, in a home, or in an outdoor setting."); *Pack 52 1990–91 Orientation Guide* (Defendants' Exhibit No. 61) at 12 (noting that Pack 52 meets monthly at the Hinsdale United Methodist Church).

*Known as 916 Douglas Ave., Elgin, Ill.,* 903 F.2d 490, 492 (7th Cir.1990), *cert. dismissed,* —— U.S. ——, 111 S.Ct. 1090, 112 L.Ed.2d 1194 (1991). Title II provides, in relevant part, as follows:

(a) All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination or segregation on the ground of race, color, religion, or national origin.

(b) Each of the following establishments which serves the public is a place of public accommodation within the meaning of this subchapter if its operations affect commerce, or if discrimination or segregation by it is supported by State action:

.     .     .     .     .

(3) any motion picture house, theater, concert hall, sports arena, stadium or other place of exhibition or entertainment; ...

....

(c) The operations of an establishment affect commerce within the meaning of this subchapter if ... (3) in the case of an establishment described in paragraph (3) of subsection (b) of this section, it customarily presents films, performances, athletic teams, exhibitions, or other sources of entertainment which move in commerce; .... For purposes of this section, "commerce" means travel, trade, traffic, commerce, transportation, or communication among the several States, or between the District of Columbia and any State, or between any foreign country or any territory or possession and any State or the District of Columbia, or between points in the same State but through any other State or the District of Columbia or a foreign country.

**22.** Subsection (e) of the statute sets forth the private club exemption. Because the Court concludes that the Boy Scouts does not constitute a place of public accommodation to which Title II would presumptively apply, it need not determine the pertinence of the private club exemption here.

....[22]

42 U.S.C. § 2000a. Plaintiffs contend that given the Boy Scouts' emphasis upon recreational activities and the enjoyment of its members, it qualifies as a "place of entertainment" within the meaning of subsection (b)(3) above. In contrast, defendants have argued that the Boy Scouts does not fit within either the ordinary understanding of the term "place" or the category of establishments cited within the statute as "places of entertainment."

■ The Court is therefore called upon to resolve whether the term "place," as it is used to modify the terms "public accommodation" and "entertainment," should be accorded its literal connotation of a physical site or whether it should be taken simply as a term of convenience which does not limit the reach of Title II to accommodations which have a specific location or facility. Although the Court has discussed this issue below largely in the context of construing the phrase "place of public accommodation," the analysis applies with equal force to the statutory subcategory of "places of entertainment" into which plaintiffs contend the Boy Scouts falls.

The parties have not cited, and the Court has been unable to locate, any federal case which expressly considers whether or not a membership organization, the activities of which do not center upon a particular facility or "place," can qualify as a "place of entertainment" or other "place of public accommodation" for purposes of Title II. However, a number of state courts have considered this question in applying anti-discrimination statutes which contain language similar to that of Title II. As set forth below, a renewed study of these cases, considered in light of the evidence presented in this case, leads the Court to conclude that the Boy Scouts does not constitute a "place of public accommodation" within the framework of Title II.[23] More-

**23.** The Court initially considered these authorities when it ruled upon defendants' motion to dismiss the complaint, which required the Court to construe the pleadings in a light most favorable to the plaintiffs. At that time, however, the Court did not have the benefit of an evidentiary record before it, and held only that the Boy

over, a review of federal cases which have considered the applicability of Title II to membership organizations confirms that Title II has never been applied so broadly as to encompass organizations which lack a tie to a facility of the kinds enumerated in the statute. At the same time, a perusal of the legislative history of the statute suggests that the use of the term "place" in the statute reflects a congressional understanding that Title II would not be applied more expansively.

At least four state courts have rejected the notion that a membership organization in and of itself may be considered a "place" for purposes of state laws prohibiting discrimination in places of public accommodation: *United States Jaycees v. Iowa Civil Rights Commission,* 427 N.W.2d 450 (Iowa 1988); *United States Jaycees v. Massachusetts Commission Against Discrimination,* 391 Mass. 594, 463 N.E.2d 1151 (1984); *United States Jaycees v. Richardet,* 666 P.2d 1008 (Alaska 1983); and *United States Jaycees v. Bloomfield,* 434 A.2d 1379 (D.C.App.1981). As the case names reveal, the courts in each of these cases considered the Jaycees, a membership organization which does not operate from a particular facility or location. At issue in each of the cases was the validity of the Jaycees' policy of excluding women from full membership in the organization in light of legislation barring discrimination on the basis of sex in public accommodations. The courts in all of these cases found the use of the term "place" in the governing statutes to be significant, and because the Jaycees was not tied to a particular location or facility, they concluded that the organization was beyond the reach of those statutes.

*United States Jaycees v. Massachusetts Commission Against Discrimination* (*"MCAD"*) is illustrative. In this case the Massachusetts Commission Against Discrimination ("MCAD") had found that the U.S. Jaycees' policy of excluding women from membership violated the Massachusetts statute barring gender discrimination

in "any place of public accommodation, resort or amusement." The Jaycees sought judicial review of MCAD's decision, and the case was certified to the state supreme court. That court concluded that the Jaycees did not constitute a place of public accommodation for purposes of the statute.

The Massachusetts court began by observing what a "tortuous analysis" was required in order to deem the U.S. Jaycees a "place of public accommodation." 463 N.E.2d at 1155.

> [T]he MCAD observed that the State and local Jaycees chapters certainly do meet in physical "place[s]" within Massachusetts, albeit a large number of different ones. Since a "sufficiently strong nexus" exists between the U.S. Jaycees and the State and local organizations, when the latter two meet at a "place" within Massachusetts, it can be hypothesized that the national organization is meeting at that "place" also. The membership of the U.S. Jaycees is demonstrably "public": all males who are between the ages of eighteen and thirty-five and who pay the dues are admitted to the organization. If the assumption that membership in the national Jaycees organization can be tied to a "place" in Massachusetts is then combined with the observation that such membership is "public," it is possible to reach the same conclusion as the MCAD, that the U.S. Jaycees is a "place of public accommodation" within the meaning of [the Massachusetts statute]. While this line of reasoning is relatively easy to follow, it is hard to accept.

*Id.* The court found *MCAD's* rationale inconsistent with the statute's emphasis upon the word "place." The statute defined a place of public accommodation "to include any place ... which is open to and accepts or solicits the patronage of the general public." In the court's view, "place" should not be treated as a term of art defined in technical terms, but rather should be interpreted in light of its ordinary connotation of a physical environ-

---

Scouts *might* qualify as a place of public accommodation for purposes of Title II. *See* 742

F.Supp. at 1421.

ment. *Id.* at 1155–56. To bring within the definition of "places of public accommodation" any organization which met at "places," the court reasoned, would accord the Massachusetts statute a sweeping application; ignore the commonly understood definition of a term the legislature had used; and bring the statute to bear upon a category of institutions unlike any of the examples cited in the statute, each of which conformed to the ordinary notion of a "place." *Id.* at 1156.

> [T]he MCAD's interpretation of [the statute] as including the U.S. Jaycees does not call for the mere addition of another physical "site" to the statutory language, but instead it requires the addition of a type of "conduct" (a nonprofit organization's membership policy). Such an interpretation cannot be derived from the plain language or a reasonable construction of [the statute].

*Id.* at 1159.

Finally, the Massachusetts court noted the significant difference between the Jaycees and organizations in which membership serves as the means of access to a physical facility. Distinguishing *National Organization for Women v. Little League Baseball, Inc.,* 127 N.J.Super. 522, 318 A.2d 33, *aff'd mem.,* 67 N.J. 320, 338 A.2d 198 (1974) (holding Little League to be a public accommodation), and *United States v. Slidell Youth Football Association,* 387 F.Supp. 474 (E.D.La.1974) (holding football league to be a public accommodation under Title II), the court explained:

> In both cases, although an organization's membership policy was implicated, membership in the relevant entity served effectively as the "ticket" for admission to a particular "place." In *Slidell Youth Football Ass'n, supra* at 477, the "place" was a sports facility containing "two fully equipped football fields,

grandstands and a food concession stand enclosed in a chain link fence," the facility being "utilized solely to play SYFA sponsored youth football league games." In *Little League Baseball, Inc., supra* at 531, 318 A.2d 33, the "place of public accommodation ... [was] obviously the ball field at which tryouts are arranged, instructions given, practices held and games played." It is important to distinguish the case of a discriminatory membership policy (which the U.S. Jaycees concededly practices) from circumstances where the denial of membership is used as a method for denying access to a particular place.

463 N.E.2d at 1159.[24]

Other courts have echoed the Massachusetts court's emphasis upon statutory use of the term "place" and the common understanding of that term. *See Iowa Civil Rights Commission,* 427 N.W.2d at 454; *Richardet,* 666 P.2d at 1011; *Bloomfield,* 434 A.2d at 1381. Like the Massachusetts court, these courts have also noted that membership organizations stand apart from the types of "places" typically listed in public accommodations statutes. *Richardet,* 666 P.2d at 1011–1012. *See also Iowa Civil Rights Commission,* 427 N.W.2d at 454–55.

The courts of other states have struck out upon a different path and have interpreted their anti-discrimination statutes more broadly to reach membership organizations, including the Boy Scouts. *See Quinnipiac Council, Boy Scouts of America, Inc. v. Commission on Human Rights and Opportunities,* 204 Conn. 287, 528 A.2d 352 (1987); *United States Power Squadrons v. State Human Rights Appeal Board,* 59 N.Y.2d 401, 465 N.Y.S.2d 871, 452 N.E.2d 1199 (1983); *Curran v. Mount Diablo Council of the Boy Scouts*

---

**24.** The Massachusetts court noted further that all Jaycees events were open to the public; consequently, the denial of membership in the organization did not serve as a bar to a given place. *See* 463 N.E.2d at 1159. In contrast, although the evidence indicates that family members are invited to some Boy Scout events, such as pack meetings, most of the organization's activities are not open to the public. Nonetheless, as set forth below, *MCAD's* logic is still relevant here, in the sense that membership in the Boy Scout organization does not serve as an entree to a particular place. As the Court noted above in its findings of fact, Boy Scout meetings and activities take place in a variety of settings (many times, private homes or churches) and for the most part, the particular location is irrelevant to what transpires at those meetings.

*of America,* 147 Cal.App.3d 712, 195 Cal. Rptr. 325 (1983); *United States Jaycees v. McClure,* 305 N.W.2d 764 (Minn.1981); *National Organization for Women v. Little League Baseball, Inc., supra,* 127 N.J.Super. 522, 318 A.2d 33 (1974) (*"NOW"*). The holdings in several of these cases rest to a significant degree upon statutory language and a body of state jurisprudence which is particularly expansive and which does not restrict application of public accommodations statutes to physical "places." In contrast, the rationale of the New Jersey court in *NOW* and the New York Court of Appeals in *Power Squadrons* cannot be explained by these circumstances; the result in those cases instead flows from an expansive reading of the term "place of public accommodation." Further discussion of each of these cases is in order.

*Curran* demonstrates the significance of liberal statutory phrasing and the resulting jurisprudence. In that case, the plaintiff sued the Boy Scouts under California's Unruh Civil Rights Act after the organization excluded him from membership because he was gay. In relevant part, the statute provided that:

> All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, or national origin are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever.

*See* 195 Cal.Rptr. at 333. The California Supreme Court previously had interpreted the act to prohibit discrimination based upon sexual orientation. *See Stoumen v. Reilly,* 37 Cal.2d 713, 234 P.2d 969, 971 (1951). Therefore, the question presented in this case was whether or not the Boy Scouts constituted a "business establishment" within the meaning the statute. The trial court concluded that it did not; but the appellate court disagreed and reversed.

The legislative history of the Unruh Act figured prominently in the appellate court's decision. In particular, the court noted that although the original version of the statute had employed the same "places of public accommodation" phrasing found in the comparable statutes of other states, the California legislature had subsequently abandoned that term in favor of "business establishments of every kind whatsoever." 195 Cal.Rptr. at 334. This revision was made after the state judiciary had placed a narrow construction upon the kinds of public accommodations reached by the statute. *Id.*

The court also relied heavily upon a line of California cases which had given the revised version of the Unruh Act an extremely broad application. This included cases which defined the term "business" to mean "everything about which one can be employed," *id.* at 335 (quoting *Mansfield v. Hyde,* 112 Cal.App.2d 133, 245 P.2d 577, 581 (1952)), and the term "establishment" to include "not only a fixed location, such as the 'place where one is permanently fixed for residence or business,' but also a permanent 'commercial force or organization' or 'a permanent settled position (as in life or business),'" 195 Cal.Rptr. at 335 (quoting *Burks v. Poppy Construction Co.,* 57 Cal.2d 463, 20 Cal.Rptr. 609, 612, 370 P.2d 313, 316 (1962)). In addition, the court noted that the act had been held to reach even not-for-profit associations. 195 Cal.Rptr. at 335–36, citing *O'Connor v. Village Green Owners Association,* 33 Cal.3d 790, 191 Cal.Rptr. 320, 662 P.2d 427 (1983).[25]

Thus, the court rendered its decision against the backdrop of a statute which spoke broadly in terms of "business establishments of every kind whatsoever" and a well established line of authority which had interpreted the statute in a manner true to the expansive language the California legislature had chosen. Because the plain-

---

**25.** In contrast, the Supreme Court of Oregon concluded in *Schwenk v. Boy Scouts of America,* 275 Or. 327, 551 P.2d 465, 468 (1976), that the Oregon Public Accommodation Act was intended "to prohibit discrimination by *business or commercial enterprises* which offer goods or services to the public," and not to organizations like the Boy Scouts and the YMCA and YWCA. (Emphasis supplied.)

tiff's complaint attributed to the Boy Scouts certain "businesslike attributes," the court concluded that the organization could fall within the definition of a "business establishment" for purposes of the Unruh Act despite its status as a not-for-profit association. 195 Cal.Rptr. at 336.

In *McClure*, the Minnesota Supreme Court was confronted with an equally broad statutory provision. Although, like Title II, the Minnesota statute banned discrimination by any "place of public accommodation," the Minnesota legislature had, in the court's words, given that term "its own special and unusually broad definition," 305 N.W.2d at 766. Thus, the statute defined "place of public accommodation" to include:

> a business, accommodation, refreshment, entertainment, recreation, or transportation facility of any kind, whether licensed or not, whose goods, services, facilities, privileges, advantages, or accommodations are extended, offered, sold, or otherwise made available to the public.

*See id.* As the court noted, "The legislature defines a term only because it intends in some measure to depart from the ordinary sense of the term. Thus, there is a presumption that we are not to substitute the literal, ordinary meaning of 'place of public accommodation' for the definition the legislature has provided." *Id.* The court also took heed of the legislature's explicit directive to construe the provisions of the statute liberally. *Id.*

Given the broad wording of the statute, the court found that its provisions applied even to establishments which were dissimilar to the specific kinds of places cited in an older version of the statute, which remained on the books:

> [W]hile the older statute contemplated only certain fixed and mobile sites, the new statute encompasses a "business facility of any kind," whether fixed or mobile. While the older statute concentrated on the kinds of sites where discrimination would be prohibited, the new statute focuses on *conduct* in which discrimination would be prohibited and thus speaks not of a business facility *where* goods

and privileges are offered, but rather, of "a business * * * facility of any kind * * * *whose* goods * * * [and] privileges are * * * offered, sold, or otherwise made available to the public."

*Id.* at 768 (emphasis in original).

The court went on to find that the U.S. Jaycees constituted a public business within the meaning of the Minnesota statute. Based upon the record before it, the court was convinced that the Jaycees was "a national organization that regards its members more as customers than as owners" and that membership in the organization amounted to a "product"; thus, the Jaycees qualified as a "business." *Id.* at 769. It also constituted a "public" business, "[b]y virtue of its unselective, vigorous sale of memberships...." *Id.* at 771.

Finally, the court determined that the U.S. Jaycees constituted a "facility" despite the fact that the national organization lacked an office or other physical "place" within Minnesota's borders. *Id.* at 772–74. The court reiterated that the terms of the newer statute reflected a shift away from an emphasis upon particular *sites* and toward an emphasis upon the *conduct* of businesses. *Id.* at 772. Consequently, the court reasoned, a court need not deem a given entity analogous to a hotel or restaurant in order to find the public accommodations statute applicable. *Id.*

> Food and lodging do not exhaust the category of a "business * * * facility of any kind * * * *whose* goods, * * * *privileges*, [and] *advantages* are * * * sold or otherwise made available to the public." Minn.Stat. § 363.01(18) (1980) (emphasis added). Leadership skills are "goods," business contacts and employment promotions are "privileges" and "advantages," and each site in the State of Minnesota where the sale of those "goods" is solicited, promoted, and consummated is unquestionably a "business facility."

*Id.* (emphasis in original). The court further reasoned that to the extent a particular site need be identified as a "facility" for purposes of the statute, there were two which sufficed. The first was the office of

the Minnesota Jaycees affiliate, where officers of the state organization supervised the recruitment activities of local chapters. *Id.* The second site lay "in the sometimes door-to-door, company-to-company solicitation of members for the organization" and "in the oft-shifted sites at which the affiliated local chapters hold meetings during part of which a sales approach is usually made to prospective members invited to the meeting for that purpose." *Id.*

> What we decide here is that an organization engaged in the business of seeking to advance its members and to add to their ranks by assiduously selling memberships in this state is a "public business facility." In more familiar terms, such an organization has more than the "minimum contacts" to qualify as doing business in this state, and its facilities are anywhere it promotes, solicits, and engages in the sale of memberships on an unselective basis.

*Id.* at 774.

*Quinnipiac Council* addressed a statute which the Connecticut supreme court found to be as broadly drafted as the Minnesota statute. *See* 528 A.2d at 358. In that case, a woman contended that the Boy Scouts had violated the state's public accommodations statute when it refused to permit her to serve as the scoutmaster of a local troop. The statute guaranteed to Connecticut citizens the right to "full and equal accommodations in every place of public accommodation, resort, or amusement." The phrase "place of public accommodation, resort or amusement" was defined to include:

> [A]ny establishment, which caters or offers its services or facilities or goods to the general public including, but not limited to, public housing projects and all other forms of publicly assisted housing, and further including any housing accommodation, commercial property or building lot, on which it is intended that a housing accommodation or commercial building will be constructed, offered for sale or rent, and mobile home parks....

*See* 528 A.2d at 354. The Boy Scouts contended that the statute was limited to phys-

ical sites and could not be applied to membership organizations. However, the court rejected this argument in light of the way in which "places of public accommodation" had been defined and in light of the legislative history.

Because the statute was ambiguous to the extent it defined "place of public accommodation" in terms of "any establishment" which offered its services to the public rather than in terms of physical sites, the court found it necessary to examine the legislative history. 528 A.2d at 357. The court noted first that public accommodation statutes were derived from the common law duties of innkeepers and common carriers. *Id.* at 357. Consistent with those origins, the original version of Connecticut's public accommodations statute, which listed a variety of "places of public accommodation" that the legislature deemed to fall within the reach of the statute, included railroad cars, despite their lack of a fixed location. *Id.* at 357–58. Later, the "laundry list" of particular accommodations was dropped from the statute in favor of the provision defining a "place of public accommodation" as "any establishment which caters or offers its services or facilities or goods to the general public." *Id.* at 358. The legislative history was thus one of "steadily expanded coverage." *Id.* Paying heed to the remedial ends of the statute and the state's compelling interest in eradicating gender discrimination, the court concluded that the statutory history, coupled with the "unconditional language of the statute," rendered it unnecessary for an establishment to have an identifiable location in order for the public accommodations act to apply. 528 A.2d at 358.

> Like Minnesota's similarly broadly drafted public accommodation statute, whose comprehensive applicability was recognized in *United States Jaycees v. McClure*, 305 N.W.2d 764 (Minn.1981), and held to be constitutional in *Roberts v. United States Jaycees*, [468 U.S. 609, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984)], our statute now regulates the discriminatory conduct and not the discriminatory

situs of an enterprise which offers its services to the general public.

528 A.2d at 358 (footnote omitted).[26]

In contrast to these cases, *NOW*, 318 A.2d 33, did not deal with a broadly worded statute. Instead, the New Jersey statute, much like Title II, simply barred the operator of any "place of public accommodation" from refusing to provide its "accommodations, advantages, facilities, or privileges" on any of the grounds specified in the statute. In this case, the Little League appealed from an order of the New Jersey Division of Civil Rights requiring the league to admit girls into its baseball programs. One of the grounds upon which the Little League objected to the order was that the group did not constitute a "place of public accommodation" which was barred from discriminating on the basis of gender.

Although the Little League was a membership organization which did not operate from a fixed parcel of real estate within New Jersey, the court nonetheless concluded that it qualified as a "place of public accommodation." The court began with the proposition that the public accommodations statute was a remedial law which should be applied in a manner "sympathetic to its objectives." *Id.* at 37. It then went on to hold that the term "place" should not be construed in such a manner as to limit the reach of the statute to the kinds of establishments normally thought of as public accommodations:

> The statutory noun "place" (of public accommodation) is a term of convenience, not of limitation. It is employed to reflect the fact that public accommodations are commonly provided at fixed "places," *e.g.*, hotels, restaurants, swimming pools, etc. But a public conveyance, like a

train, is a "place" of public accommodation although it has a moving situs. *See* N.J.S.A. 10:5–5(1), ("public conveyance"). The "place of public accommodation" in the case of Little League is obviously the ball field at which tryouts are arranged, instructions given, practices held and games played. The statutory "accommodations, advantages, facilities and privileges" at the place of public accommodation, N.J.S.A. 10:5–12(f), is the entire agglomeration of the arrangements which Little League and its local chartered leagues make and the facilities they provide for the playing of baseball by the children....

> Little League is a *public* accommodation because the invitation is open to the children in the community at large, with no restriction (other than sex) whatever. *See Clover Hill Swimming Club v. Goldsboro*, 47 N.J. 25, 33, 219 A.2d 161 (1966). It is public in the added sense that local governmental bodies characteristically make the playing areas available to the local leagues, ordinarily without charge.

318 A.2d at 37. Thus, under *NOW*'s rationale, a membership organization need not *be* a "place" in order to come within the reach of a statute like Title II, so long as its activities center upon an identifiable location.[27] *Accord Kiwanis International v. Ridgewood Kiwanis Club*, 627 F.Supp. 1381, 1387 (D.N.J.) (Kiwanis organization constitutes a "place of public accommodation" within meaning of New Jersey statute because it conducts its meetings in places like restaurants to which public is unselectively invited), *rev'd*, 806 F.2d 468 (3d Cir.1986), *cert. dismissed*, 483 U.S. 1050, 108 S.Ct. 362, 97 L.Ed.2d 812 (1987).

---

**26.** Although the court concluded that the Boy Scouts was a "place of public accommodation" *within the meaning of the Connecticut statute*, it went on to hold that the act of denying the plaintiff the position of scoutmaster did not constitute a denial of access to a public accommodation. 528 A.2d at 360. The court reasoned that in seeking to become an adult leader, the plaintiff was attempting not to receive goods or services from the Boy Scouts, but to offer her own services to the organization. *Id.* In the

court's view, the public accommodations statute did not reach this kind of situation. *Id.*

**27.** *NOW* leaves some room for dispute as to whether or not the site of the organization's activities must be a public one in order for the organization to be deemed a place of public accommodation. *Compare McClure*, 305 N.W.2d at 773, *with Bloomfield*, 434 A.2d at 1382.

As in *NOW,* the result in *Power Squadrons* cannot fairly be attributed to broad statutory phrasing. In that case, three women had been denied membership in the United States Power Squadrons, a national not-for-profit organization which promoted safety and skill in boating through public educational programs sponsored by its local squadrons. Membership in the organization was restricted to men. The plaintiffs contended that the Power Squadron's membership policy constituted gender discrimination contrary to New York's public accommodations statute. The New York law prohibited discrimination in "any place of public accommodation, resort, or amusement." *See* 465 N.Y.S.2d at 874, 452 N.E.2d at 1202. An illustrative laundry list of such places was set forth in the statute:

The term "place of public accommodation, resort or amusement" shall include, except as hereinafter specified, all places included in the meaning of such terms as: inns, taverns, road houses, hotels, motels, whether conducted for the entertainment of transient guests or for the accommodation of those seeking health, recreation or rest, or restaurants, or eating houses, or any place where food is sold for consumption on the premises; buffets, saloons, barrooms, or any store, park or enclosure where spirituous or malt liquors are sold; ice cream parlors, confectioneries, soda fountains, and all stores where ice cream, ice and fruit preparations or their derivatives, or where beverages of any kind are retailed for consumption on the premises; wholesale and retail stores and establishments dealing with goods or services of any kind, dispensaries, clinics, hospitals, bathhouses, swimming pools, laundries and all other cleaning establishments, barber shops, beauty parlors, theatres, motion picture houses, airdromes, roof gardens, music halls, race courses, skating rinks, amusement and recreation parks, trailer camps, resort camps, fairs, bowling alleys, golf courses, gymnasiums, shooting galleries, billiard and pool parlors; garages, all public conveyances operated on land or water or in the air, as well as the stations and terminals thereof; travel or tour advisory services, agencies or bureaus; public halls and public elevators of buildings and structures occupied by two or more tenants, or by the owner and one or more tenants.

*See* 465 N.Y.S.2d at 875 n. 1, 452 N.E.2d at 1203 n. 1. New York's high court concluded that an organization which conducted public activities fell within the embrace of this definition.

The court noted at the outset that the definition of places of public accommodation had repeatedly been enlarged over the years. In particular, it observed that original wording limiting application of the statute to the places listed in the act had ultimately been deleted, which the court took to be "a clear indication that the Legislature intended that the definition of place of accommodation should be interpreted broadly." 465 N.Y.S.2d at 875, 452 N.E.2d at 1203.

The court found two concepts embedded within the statute: "the idea of public accommodation in the broad sense of providing conveniences and services to the public, and the idea of place." *Id.* There was little question but that the Power Squadrons met the first of these two criteria. Its mission was one of public education, and consistent with that goal it sponsored boating safety courses attended by more than 70,000 people per year. *See id.* It conducted a variety of other public activities as well, each aimed at promoting public interest in boat safety and in the work of the organization itself. *Id.*

These widespread public activities to promote the Power Squadrons' goals and to solicit public interest and participation in its courses are … the equivalent of systematically offering a service or accommodation to the public and bringing petitioners within the statutory definition.

*Id.*

The court also found the second notion of "place" was satisfied, despite the fact that the Power Squadrons did not operate from a fixed location.

We define "place" as did the New Jersey court when construing similar statutory language. It is a term of convenience,

not of limitation (*see National Organization for Women v. Little League Baseball*, 127 N.J.Super. 522, 318 A.2d 33, *aff'd*, 67 N.J. 320, 338 A.2d 198; *see also, New York Roadrunners Club v. State Div. of Human Rights*, 81 A.D.2d 519, 437 N.Y.S.2d 681, *aff'd on other grounds* 55 N.Y.2d 122, 447 N.Y.S.2d 908, 432 N.E.2d 780; *Matter of Walston & Co. v. New York City Comm. on Human Rights*, 41 A.D.2d 238, 342 N.Y.S.2d 459; *United States Jaycees v. McClure*, 305 N.W.2d 764 [Minn.] ). The statute itself suggests such an interpretation because it lists places of accommodations which have no fixed place of operation but supply their services at a variety of locations, *e.g.*, travel and tour advisory services and public conveyances. The statute also applies to "establishments dealing with goods or services of any kind." Analytically, such establishments may discriminate by denying individuals access to any particular place, *e.g.*, home delivery service or services performed in the customer's home and mail order services.

465 N.Y.S.2d at 876, 452 N.E.2d at 12. The lower court had found that although the Power Squadrons did not conduct their activities at any one place, they did frequently make use of public schools and other public buildings, as well as public waterways, parks, and marinas. The court of appeals agreed that such locations supplied the "place" required in order to render the organization a "place of public accommodation":

> The place of public accommodation need not be a fixed location, it is the place where petitioners do what they do.

*Id.*

Returning for a look at Title II in light of these cases, it becomes apparent that the language of the federal statute is significantly more narrow than many of the state statutes which have been construed to embrace membership organizations. Title II does not, for example, purport to reach "business establishments of every kind whatsoever" as did the California statute at issue in *Curran*. Indeed, Title II retains the very "place of public accommoda-

tion" language which the California legislature had discarded in order to ensure that the statute would be given a broader application than the judiciary had previously given to it. Similarly, Title II does not include language referring to a business or entertainment "facility of any kind" as in *McClure*, or "any establishment, which caters or offers its services or facilities or goods to the general public" as in *Quinnipiac*. In each of these cases, the state courts emphasized that this type of phrasing was particularly broad and intended to expand the reach of the public accommodations statutes in question beyond the ordinary understanding of the term "place of public accommodation." *See McClure*, 305 N.W.2d at 766; *Quinnipiac*, 528 A.2d at 358. In contrast, the term "place" continues to figure prominently in the operative language of Title II. Consequently, cases such as *Curran, McClure*, and *Quinnipiac* are inapposite.

The remaining cases call upon the Court to choose sides in the ongoing judicial debate over the significance of the term "place." *NOW* and *Power Squadrons* posit that the term is "one of convenience, not limitation" and suggest that an enterprise need not have a fixed physical site in order to attain status as a "place of public accommodation," at least insofar as the enterprise conducts its activities at identifiable locations (*e.g.*, playing fields, public schools, and so on) which would qualify as "places" of public accommodation. *MCAD* and cases of its ilk, however, maintain that the legislature used the term "place" for a reason, and that it should be attributed its ordinary meaning. In the view of these courts, an organization should not be deemed a "place of public accommodation" unless, in *MCAD*'s words, membership in the organization functions as a "ticket" to admission to a particular site or facility.

This Court believes the reasoning of *MCAD* to be most true to the language of Title II. The word "place" and the concept of a physical site both figure prominently in Title II. "Place" appears not only in the operative phrase "place of public accommodation" in subsection (a) of the statute, but

again in subsection (b)(3) in the phrase "other place of exhibition or entertainment" which the Court is called upon to apply here. The word "establishment" is repeated throughout Title II as well. Indeed, subsection (b), the definitional portion of the statute, begins, "Each of the following establishments which serves the public is a place of public accommodation within the meaning of this subchapter. . . ." *See also* § 2000a(b)(1), (b)(2), (b)(4). The term "establishment" can have connotations which are not tied to a particular site. *See Welsh*, 742 F.Supp. at 1420 n. 11; *Burks v. Poppy Construction Co., supra*, 20 Cal. Rptr. at 611–12, 370 P.2d at 315–16 ("establishment" defined to include a permanent commercial force or organization); *but see United States Jaycees v. Iowa Civil Rights Commission, supra*, 427 N.W.2d at 454 (Jaycees did not fit within terms "place" or "establishment," each of which ordinarily "connotes a spatial dimension which the Jaycees' membership, as such, does not possess"). Yet, the specific establishments cited in Title II all constitute the usual sorts of sites one normally thinks of as places of public accommodation: inns, motels, and hotels (§ 2000a(b)(1)); restaurants, cafeterias, lunchrooms, lunch counters, soda fountains, and gasoline stations (§ 2000a(b)(2)); and motion picture houses, theaters, concert halls, sports arenas, and stadiums (§ 2000a(b)(3)). Moreover, subsection (b)(4) of the statute reiterates the concept of a fixed site by including within the establishments covered by Title II:

> any establishment (A)(i) which is *physically located within the premises of* any establishment otherwise covered by this subsection, or (ii) *within the premises of which is physically located* any such covered establishment, and (B) which holds itself out as serving patrons of such covered establishment.

42 U.S.C. § 2000a(b)(4) (emphasis supplied). Thus, the use of the term "place" in Title II, coupled with the use of fixed-cite facilities as examples of "places" and of the possibly broader term "establishments," strongly suggests that the terms "place of public accommodation" and "place of entertainment" should not be defined to include membership organizations which do not operate from a particular site or facility.

*MCAD* is also consistent with the manner in which federal courts have applied Title II to membership organizations. As noted above, the Court has been unable to locate any federal case which has addressed the significance of the term "place" in Title II and whether a membership organization *per se* can be deemed a place of public accommodation. Nonetheless, several federal cases offer clues which indicate that a membership organization must operate from a concrete facility of the types identified in Title II in order to be considered a place of public accommodation.

For example, *United States Slidell Youth Association*, 387 F.Supp. 474 (E.D.La.1974), draws an implicit distinction between a membership organization and the physical facility it operates. The subject of *Slidell* was a youth football league which refused to admit African Americans as members. The league was organized in order to promote safety in youth football and to develop the physical, mental, and moral health of its youth members and instill in them a sense of fellowship, scholarship, and citizenship. *See* 387 F.Supp. at 476. Aside from being white, a boy needed only to be of a certain age and weight, pay a fee, and execute a waiver of liability in order to become a member of the league. *See id.* at 476–77. The league owned and operated a recreational facility which included two football fields, grandstands, and a concession stand. All football games played in the league were played at this facility, and the facility was used for this purpose alone and only by the league. *See id.* at 477.

In considering whether the government had established a pattern and practice of racial discrimination, the *Slidell* court focused upon the youth association itself. *See* 387 F.Supp. at 480–81. However, the court's attention shifted to the recreational facility *operated by* the association when it considered whether or not there was a "place of entertainment" within the scope of Title II. The court did observe that the

association existed in order to provide community youth "the entertainment of playing football" and other community residents with the pleasure of watching the game played. *Id.* at 483. Yet, the court's ultimate finding was not that the *association* constituted a place of entertainment, but that the *facility* it operated was:

> [B]ecause participatory forms of entertainment are covered by 42 U.S.C. § 2000a(b)(3) and because playing football is one such form of entertainment, *the facility owned, operated and maintained by SYFA to conduct its youth football program is a place of entertainment within the meaning of 42 U.S.C. § 2000a(b)(3).*
>
> .   .   .   .   .
>
> SYFA's *facility* is also covered as [a] place of entertainment under 42 U.S.C. § 2000a(b)(3) on the basis that it offers a form of spectator entertainment to the general public. The evidence in this case shows that members of the general public are admitted to the SYFA youth football games as spectators upon payment of an admission. Many of the improvements made by SYFA to its property to prepare the property for its football program centered around this aspect of the program: the food concession stand, the grandstands, the chain link fence. The statutory language of Section (b)(3) is very clear that "... sports arena[s] and stadiums" are intended to be included within that section, and the discussions of the scope of 42 U.S.C. § 2000a(b)(3) in the cases cited above all begin with the premise that *places which offer a form of entertainment to the viewing public are within the scope of that section.*

*Id.* (emphasis supplied). *See also id.* at 484 ("it has been established that SYFA's *recreational facility* is a place of public accommodation within the meaning of 42 U.S.C. § 2000a et seq.....") (emphasis supplied); *id.* at 486 (same).

Similar reasoning has prevailed in courts which have held that local branches of the Young Men's Christian Association ("YMCA") were within the reach of Title II as "places of entertainment" and therefore were prohibited from discriminating on the basis of race. Much like the Boy Scouts, the YMCA is an eleemosynary organization which promotes the moral and spiritual development of boys through a variety of recreational, educational, and spiritual activities. *See Smith v. Young Men's Christian Association of Montgomery, Inc.,* 462 F.2d 634, 636 (5th Cir.1972); *Nesmith v. Young Men's Christian Association of Raleigh, N.C.,* 397 F.2d 96, 99–100 (4th Cir.1968). Each of the local YMCA organizations at issue in these cases was in effect open to the public, requiring only that an individual wishing to join be white and pay an annual membership fee. *See Smith,* 462 F.2d at 648; *Nesmith,* 397 F.2d at 101. As in *Slidell,* the touchstone for the court's conclusion in these cases that Title II applied to the YMCA was the physical site at which the organization sponsored its activities. *See Smith,* 316 F.Supp. 899, 912 (M.D.Ala.1970) ("The record shows that each of *the YMCA branches* (excluding the Camp branch) offers numerous recreational activities, such as swimming, scuba diving, table tennis, basketball and tennis. The Camp branch offers such activities as swimming, boating, waterskiing, archery, and arts and crafts. Furthermore, the Association's *recreational facilities* include five gymnasiums, a health club and eight swimming pools.") (emphasis supplied), *aff'd* 462 F.2d at 648; *Nesmith,* 397 F.2d at 97 ("The issue presented by this appeal is whether *the health and athletic facilities* of the Young Men's Christian Association of Raleigh, Inc. are covered by Title II....") (emphasis supplied).

This emphasis upon the facilities operated by the membership organization as the "place" of public accommodation is echoed, at least implicitly, in many other Title II cases. *See generally Durham v. Red Lake Fishing & Hunting Club,* 666 F.Supp. 954, 959 (W.D.Tex.1987) ("Courts have found places of entertainment to include health and beauty spas, golf clubs, bars and package stores, swimming pools, and athletic clubs.") (footnotes collecting cases omitted); *United States v. Lansdowne Swim Club,* 713 F.Supp. 785, 790 (E.D.Pa.1989), *aff'd,* 894 F.2d 83 (3d Cir.

1990). *See also, e.g., Auerbach v. African American Teachers Association, Inc.,* 356 F.Supp. 1046, 1048 (E.D.N.Y.1973) (white teachers ejected from public meeting called by group organized to promote the education of African Americans had shown discrimination in a place of entertainment, where organization's meetings were held in a public school auditorium) [28]; *Wesley v. City of Savannah, Georgia,* 294 F.Supp. 698, 701–02 (S.D.Ga.1969) ("[i]t is conceded by the Savannah Golf Association that the Bacon Park Course is a place of public accommodation under the Civil Rights Act of 1964"; accordingly, annual golf tournament sponsored by this private association at the golf course was subject to Title II); *Williams v. Rescue Fire Co.,* 254 F.Supp. 556, 563 (D.Md.1966) (skating arena and swimming pool built and operated by not-for-profit volunteer firefighting association constituted place of entertainment). Indeed, in a number of these cases, the courts have noted that the public facilities at issue had adopted the facade of a membership organization merely in order to circumvent Title II. *See Daniel v. Paul,* 395 U.S. 298, 302, 89 S.Ct. 1697, 1699, 23 L.Ed.2d 318 (1969) ("this 'membership' device seems no more than a subterfuge to avoid coverage of the 1964 Act"); *Williams,* 254 F.Supp. at 563 ("The so-called 'club' operation is an obvious subterfuge."); *United States v. Johnson Lake Inc.,* 312 F.Supp. 1376, 1378, 1381 (S.D.Ala.1970) (recreational club was incorporated in 1964 after enactment of Title II and insisted upon display of membership cards only after suit was filed, leading court to conclude that the club had been formed principally as a means to exclude African Americans).

As the Massachusetts court noted in *MCAD,* cases like these stand for the proposition that a membership organization comes within the reach of Title II when membership serves as a "ticket" to a particular facility of the kinds set forth in the statute. *See* 463 N.E.2d at 1159. Although none of the federal cases goes so far as to say that a membership organization cannot qualify as a place of public accommodation absent such a tie to a particular facility, this Court believes *MCAD* was correct in extrapolating this principle from the legislature's use of the term "place" as well as the results in cases like *Slidell* and *NOW v. Little League.* This distinction between membership organizations and the facilities they operate comports with the ordinary understanding of "place" and with the categories of establishments expressly cited in the statute, while at the same time ensuring that such establishments cannot evade the statute simply by adopting the mantel of a membership organization. The distinction is also consistent with the private club exemption set forth in subsection (e) of the statute. That portion of the statute provides:

> The provisions of this subchapter shall not apply to a private club or other establishment not in fact open to the public, except to the extent that the facilities of such establishment are made available to the customers or patrons of an establishment within the scope of subsection (b) of this section.

42 U.S.C. § 2000a(e). Like *MCAD,* Congress itself, in enacting subsection (e), seems to have drawn a distinction between an organization, in this case a "private club," and the facilities it operates. Subsection (e), of course, does not purport to address large organizations like the Boy Scouts (which may or may not qualify as an organization "not in fact open to the public," a disputed matter the Court does not reach in this opinion); nonetheless, the fact that the statute recognizes a distinction between organizations *per se* and orga-

---

**28.** *Auerbach* deals primarily with the question of whether a claim of unconstitutional state action could be asserted under 42 U.S.C. § 1983 based upon the group's use of public facilities. *See* 356 F.Supp. at 1048. *Cf.* Equal Access Act, 20 U.S.C. § 4071(c)(1), (5). A similar question might be raised regarding the Boy Scouts, to the extent its local affiliates promote and/or con-

duct their activities in public schools. *See* Tr. at 43 (testimony of Sandra Dixon); Tr. at 133, 519 (testimony of Boyd Ridley Critz, III); Tr. at 468–69 (testimony of James L. Valukas); Tr. at 581 (deposition testimony of William A. McCleery, III). No such contention has been made in this case, however, nor does the Court express any opinion as to this issue.

nizations which operate the sorts of facilities cited as "places of public accommodation" lends credence to *MCAD*'s "ticket" analogy. *See U.S. Jaycees v. Iowa Civil Rights Commission*, 427 N.W.2d at 455.

■ The legislative history of Title II, in contrast to the history of California's Unruh Act and some of the other state statutes which have been given a more expansive interpretation, also points toward exclusion of organizations which do not have a physical site. It is appropriate to look beyond the statutory language and delve into the legislative history only when the statute is ambiguous or where a literal interpretation of the statute would produce a result which is absurd or contrary to the goals of the statute. *United States v. Real Estate Known as 916 Douglas Ave.*, *supra*, 903 F.2d at 492. In view of the division among the state courts as to the appropriate interpretation of the term "place" in statutes comparable to Title II, arguably there is enough of an ambiguity in the federal act to invite resort to its legislative history. However, even when a court does consider the legislative history of a statute, it must do so bearing in mind that the words of the act itself reflect congressional intent; that presumption is rebutted only in the rare circumstance in which the legislative history clearly reflects a purpose contrary to the ordinary meaning of the words used. *Ardestani v. I.N.S.*, *supra*, 112 S.Ct. at 520 (citing *I.N.S. v. Cardoza–Fonseca*, 480 U.S. 421, 432 n. 12, 107 S.Ct. 1207, 1213 n. 12, 94 L.Ed.2d 434 (1987), and *Rubin v. United States*, 449 U.S. 424, 430, 101 S.Ct. 698, 701, 66 L.Ed.2d 633 (1981)). *See also American Tobacco Co. v. Patterson*, 456 U.S. 63, 68, 102 S.Ct. 1534, 1537, 71 L.Ed.2d 748 (1982); *Richards v. United States*, 369 U.S. 1, 9, 82 S.Ct. 585, 591, 7 L.Ed.2d 492 (1962).

Here, a review of the legislative history does not demonstrate an intent to depart either from the common understanding of the term "place" or from the types of facilities expressly cited as examples of places of public accommodation and places of entertainment. To the contrary, the legislative history confirms the notion that Congress meant the terms "place of public accommodation" and "place of entertainment" to be construed consistently with the ordinary meaning of those terms.

The legislative history of Title II has been described as "inconclusive" and "obscure" insofar as it concerns the intended reach of the statute. *See Miller v. Amusement Enterprises, Inc.*, 394 F.2d 342, 349 (5th Cir.1968) (en banc). Nonetheless, that history supplies a number of clues which suggest that Congress did not intend for membership organizations lacking ties to a tangible place or facility to be treated as "places" of public accommodation.

It bears noting first that in contrast to the House bill which was eventually enacted, Section 4 of the Senate bill, S. 1732, included a ban upon discrimination with respect to membership in labor unions as well as professional, business, or trade associations and organizations. *See* S.Rep. No. 872, 88th Congress, 2d Sess. (1964), *reprinted in* 1964 U.S.C.C.A.N. 2355, 2359. In this sense, the House bill which was to become Title II was far narrower in scope. *See* 110 Cong.Rec. 6533 (March 30, 1964) (remarks of Sen. Humphrey) ("The reach of that title is much narrower than when the bill was first introduced. It is also narrower than S. 1732, the bill reported by the Senate Commerce Committee, which covers the general run of retail establishments, membership in labor unions, and so forth."); *see also* 110 Cong.Rec. 7397 (April 9, 1964) (remarks of Sen. Magnuson). Indeed proponents of the bill repeatedly emphasized its limited scope. *See, e.g.,* 110 Cong.Rec. 6533 (March 30, 1964) (remarks of Sen. Humphrey) ("The bill deals with the practical problems we face. This is a bill of limitation and restraint. It is a reasonable proposal. It is directed to specific, known, abuses."); *id.* at 6534 ("Title II, like the bill as a whole, is designed to reach the most significant manifestations of discrimination. It is carefully drafted and moderate in nature. There is no desire to regulate truly personal or private relationships."); 110 Cong.Rec. 8253 (April 17, 1964) (remarks of Sen. Prouty) ("Equal access to public accommodations involves few new jurisprudential concepts.") *See also*

110 Cong.Rec. 8344 (April 18, 1964) (remarks of Sen. Proxmire); 110 Cong.Rec. 1629 (February 1, 1964) (remarks of Rep. Halpern).

Moreover, throughout the debates upon the bill, when referring to the kinds of facilities which would be considered "places of public accommodation," members of Congress simply echoed the list of covered establishments expressly identified in the bill—*e.g.* hotels and motels, restaurants, etc.—without any acknowledgment that the bill might reach other kinds of establishments or organizations. *See, e.g.,* 110 Cong.Rec. 6533 (March 30, 1964) (remarks of Sen. Humphrey) ("The business enterprises covered by section 201 include hotels and motels …, restaurants and lunch counters, … gasoline stations, and motion-picture houses, theaters, sports arenas, and other public places of exhibition or amusement. These are the establishments covered by title II."); *id.* at 6534 ("I should like to emphasize that the establishments covered are very clearly described in section 201(b)."); *id.* at 6356; 110 Cong.Rec. 6557 (March 30, 1964) (remarks of Sen. Kuchel) ("The House-passed bill does not in title II cover all places of public accommodation, but it does cover those establishments whose discriminatory practices, when they have occurred, have resulted in great distress and anguish. Specifically, the bill expressly provides that all persons shall have access to the following places of public accommodation without regard to race, color, religion, or national origin: places of lodging, such as hotels, and motels …; eating establishments; places of amusement such as theaters and sports arenas; [and] gasoline stations…."); 110 Cong. Rec. 7404 (April 9, 1964) (remarks of Sen. Magnuson) (citing examples of places of entertainment); *id.* at 7410 ("Simply stated, the bill merely seeks to establish the right of all persons, without regard to race, color, religion, or national origin, to the full and equal enjoyment of the services and facilities of a variety of places of business serving the general public."). Again, lawmakers stressed the limited nature of the bill. *See* 110 Cong.Rec. 1640 (February 1, 1964) (remarks of Rep. Senner) ("Title II is

moderate legislation. It invades no man's privacy and compels no personal or confidential relationships. It deals only with places which have traditionally held out services and facilities to the general public."); 110 Cong.Rec. 1926 (February 4, 1964) (remarks of Rep. Moorehead) ("[T]itle II is not a radical change, it merely expands the ancient and familiar rule with respect to inns to such places as restaurants, gasoline stations, and places of exhibition or entertainment, as has been done by some 31 States and the District of Columbia."). *See also* 110 Cong.Rec. 12614 (June 3, 1964) (remarks of Sen. Muskie); 110 Cong.Rec. 7785 (April 13, 1964) (remarks of Sen. Smathers); 110 Cong.Rec. 7383 (April 9, 1964) (remarks of Sen. Young); 110 Cong.Rec. 1511 (remarks of Rep. Madden).

Indeed, proponents of the bill repeatedly stressed the fundamental right to unrestrained interstate travel and the economic significance of interstate commerce in explaining why it was important that these types of facilities not be permitted to discriminate. *See, e.g.,* 110 Cong.Rec. 1642 (February 1, 1964) (remarks of Rep. Ryan) ("For the white person traveling from State to State, the road is a series of familiar landmarks. Frequently his most difficult problem is to choose among the array of establishments offering food, lodging, and respite. But for the Negro traveler, the road may be more like a desert and each inviting sign a mirage or, worse yet, a humiliating rebuff to him, his family or companions."); 110 Cong.Rec. 6528, 6535 (March 30, 1964) (remarks of Sen. Humphrey) ("the lack of facilities at which to rest and at which to eat is a substantial impediment to interstate travel and commerce"); 110 Cong.Rec. 6557 (March 30, 1964) (remarks of Sen. Kuchel) ("There can be no question but that segregation in public accommodations obstructs and restricts interstate travel and the sale of related goods and services. The market for national entertainment such as community concerts, athletic competitions and motion pictures is surely restricted by such a local situation. National industries seeking new

sources of manpower and availability to growing urban markets are inhibited from locating their offices and plants in areas where racial strife is likely to occur."); 110 Cong.Rec. 7397, 7398, 7412–13 (April 9, 1964) (remarks of Sen. Magnuson). *See also id.* at 7402; S. Report 872, *supra,* 1964 U.S.C.C.A.N. at 2371–72; 110 Cong. Rec. 8343 (April 18, 1964) (remarks of Sen. Proxmire); 110 Cong.Rec. 1594 (February 1, 1964) (remarks of Rep. Farbstein).

Opponents of the bill in turn argued that the bill represented an intrusion upon the property rights of business owners, and as such constituted a violation of the Fifth Amendment. *See* House of Representatives Minority Report Upon Proposed Civil Rights Act of 1963, Committee on Judiciary Substitute for H.R. 7152, 88th Cong., 2d Sess., *reprinted in* 1964 U.S.C.C.A.N. 2431, 2441 ("Places of 'public accommodation' do not cater by custom to one race in preference to another solely from proprietary preference. People are in business to make money and in certain areas they have learned, or have reason to believe, it is more profitable to serve only one race or another.... A host follows the customs of his community else he suffers, economically. To force him to abandon his practice, to run counter to prevailing opinion, is to injure his business and his property."); 110 Cong.Rec. 1606 (February 1, 1964) (remarks of Rep. Dorn) ("Title II will give the Attorney General gestapo power over hotels, motels, restaurants, cafeterias, lunchrooms, gasoline stations, and so forth. This section is a most sinister and calculated attack upon property rights."); 110 Cong.Rec. 7756 (April 13, 1964) (remarks of Sen. Holland) ("[T]he owners of the thousands of fine hotels, motels, restaurants, boarding houses, and so forth, might be deprived of their constitutional rights to manage their own businesses which they have built up by hard work, sacrifice, and investment of their own hard earned money.... [E]nactment of this vicious, socialistic legislation strikes at the very heart of the Constitution upon which this Republic was founded and upon which our basic system of private enterprise, which we hold so high, lives and thrives."); 110 Cong.Rec.

7784, 7786 (April 13, 1964) (remarks of Sen. Smathers, quoting congressional testimony of Florida Gov. Bryant) ("We are dealing here today with property rights.... The debate in which we are now engaged is over the assertion of a new right: The right of nonowners of property to appropriate it from the owners."); 110 Cong.Rec. 12700 (June 4, 1964) (remarks of Sen. Byrd) ("Title II constitutes a radical departure from established constitutional principles, and would constitute an invasion of the property rights of owners of privately owned establishments.") *See also* 110 Cong.Rec. 8081–82 (April 15, 1964) (remarks of Sen. Ervin); 110 Cong.Rec. 8356 (April 18, 1964) (remarks of Sen. Eastland); 110 Cong.Rec. 5958 (March 23, 1964) (remarks of Sen. Thurmond); 110 Cong.Rec. 2791 (February 10, 1964) (remarks of Rep. Grant); 110 Cong.Rec. 1988 (February 5, 1964) (remarks of Rep. Whitten); 110 Cong. Rec. 1977 (February 5, 1964) (remarks of Rep. Fuqua); 110 Cong.Rec. 1629 (February 1, 1964) (remarks of Rep. Andrews); 110 Cong.Rec. 1618 (February 1, 1964) (remarks of Rep. Abernethy); 110 Cong.Rec. 1617 (February 1, 1964) (remarks of Rep. Roberts); 110 Cong.Rec. 1611 (February 1, 1964) (remarks of Rep. Sikes).

Thus, the legislative history demonstrates an understanding that Title II would reach only the types of businesses commonly understood to be places of public accommodation. Without question, opponents of the bill perceived it as a radical measure. *See, e.g.,* 110 Cong.Rec. 2791 (February 10, 1964) (remarks of Rep. Grant) ("This could well be the Appomattox of constitutional liberties for all Americans."); 110 Cong.Rec. 6071 (March 24, 1964) (remarks of Sen. Long) ("this radical legislation would create a whole pack of wolves to be used against the rights of individual Americans"); 110 Cong.Rec. 3713 (February 26, 1964) (remarks of Sen. Ervin) ("This bill constitutes the most drastic assault on constitutional government ever proposed in the history of our Nation."); 110 Cong.Rec. 2472 (February 7, 1964) (remarks of Rep. Matthews) ("Title II, the so-called public accommodations pro-

vision of the bill, is the most brazen attempt to impose Federal authority directly on private citizens and private property since the ill-fated Civil Rights Act of 1875."). However, their concern focused upon the intrusion into the operation of businesses like restaurants and hotels, not membership organizations like the Jaycees or the Boy Scouts. *See, e.g.,* 110 Cong.Rec. 3713–14 (February 27, 1964) (remarks of Sen. Ervin) ("It seems to me that the Federal Government should devote its attention to something more important than telling shoeshine boys whose shoes they should shine.") At the same time, proponents of the bill stressed that it was a moderate measure designed to address the denial of access to public facilities which had contributed to the racial strife which confronted the nation. *See, e.g.,* 110 Cong. Rec. 8062 (April 15, 1964) (remarks of Sen. Johnston) ("The list of businesses expressly covered by the title consists of places of public accommodation in which racial discrimination is particularly humiliating and causes the greatest inconvenience. Moreover, the list focuses on situations in which congressional action can clearly produce prompt and significant relief."); *see also* pages 1535–36, *supra.* There is no hint in the legislative history that Title II would be construed so broadly as to reach membership organizations which had little or no connection to the sorts of facilities normally thought of as places of public accommodation. *See* 110 Cong.Rec. 7406 (April 9, 1964) (remarks of Sen. Magnuson) ("Performances produced by private organizations, like fraternal groups, in places to which the public is not invited are outside the scope of Title II."); *id.* at 7407 ("Service or professional establishments would not generally be covered unless they are physically located within the premises of a covered establishment and hold themselves out as serving the patrons thereof."). Thus, this is not a case in which the legislative history of the statute merely fails to establish a clear intent contrary to the ordinary meaning attached to Title II's terminology. *Cf. United States v. Johnson Lake Inc., supra,* 312 F.Supp. at 1380 ("The word 'entertainment' as used in [42

U.S.C. § 2000a(b)(3) ] was intended to carry its ordinary meaning. . . .") Instead, the history of the act tends to confirm that Title II was not meant to be so sweeping a measure as to reach membership organizations *per se.*

■ The Court is cognizant of the fact that Title II is to be construed liberally and that its language should not be interpreted so narrowly as to conflict with the statute's remedial aim. *See, e.g., Miller v. Amusement Enterprises, Inc., supra,* 394 F.2d at 349 ("We do not read [Title II] with narrowed eye but with open minds attuned to the clear and strong purpose of the Act, namely, to secure for all citizens the full enjoyment of facilities described in the Act which are open to the general public."). In particular, the Court recalls the admonition of the majority in *Daniel v. Paul, supra,* 395 U.S. at 308, 89 S.Ct. at 1702, regarding the proper construction of the term "place of entertainment":

> In light of the overriding purpose of Title II "to [re]move the daily affront and humiliation involved in discriminatory denials of access to facilities ostensibly open to the general public," H.R.Rep. No. 914, 88th Cong., 1st Sess., 18, we agree with the en banc decision of the Court of Appeals for the Fifth Circuit in *Miller v. Amusement Enterprises, Inc.,* 394 F.2d 342 (1968), that the statutory language "place of entertainment" should be given *full* effect according to its generally accepted meaning. . . .

(Emphasis in original.) *See Welsh,* 742 F.Supp. at 1419; *Lansdowne Swim Club,* 713 F.Supp. at 790. Thus, the Court recognizes that an establishment may qualify as a "place of entertainment" for purposes of Title II even though it is not among those expressly cited in the statute. *See Miller,* 394 F.2d at 350 ("Although we recognize that *ejusdem generis* is an old and accepted rule of statutory construction, we do not believe that it compels us to accord words and phrases embodied in the statute a definition or interpretation different from their common and ordinary meaning; or that the rule requires us to interpret the statute in such a narrow fashion as to defeat what we

conceive to be its obvious and dominating general purpose."); *United States v. DeRosier*, 473 F.2d 749, 752 (5th Cir.1973) (neighborhood bar qualified as "place of entertainment" although it was unlike the establishments cited in the statute).[29]

However, there comes a point at which giving the statutory language its "full effect according to its generally accepted meaning" will result in the exclusion of certain establishments which do not conform to the ordinary understanding of the term "place of entertainment." This is such a case. There may well be merit to the contention that the principal focus of statutes like Title II is upon the denial of access to accommodations rather than upon the concept of "place." *See Kiwanis International v. Ridgewood Kiwanis Club, supra*, 627 F.Supp. at 1387 (D.N.J.); *Power Squadrons*, 465 N.Y.S.2d at 875–76; *Quinnipiac Council*, 528 A.2d at 358. *See also Welsh*, 742 F.Supp. at 1420–21. However, the Court is not free to disregard the plain language Congress has used or the ordinary meaning of that language. Congress enacted a law addressing the "place of public accommodation"; and it did not define that term in such a way as to signal a departure from the usual connotations of that phrase. It did not define the term as "any establishment which caters or offers its services or facilities or goods to the general public," (*see Quinnipiac Council*, 528 A.2d at 358); nor as "all business establishments of every kind whatsoever" (*see Isbister v. Boys' Club of Santa Cruz, Inc.*, 40 Cal.3d 72, 219 Cal.Rptr. 150, 153, 707 P.2d 212, 215 (1985); *Curran*, 147 Cal. App.3d 712, 195 Cal.Rptr. at 334–36); nor as "a business, accommodation, refreshment, entertainment, recreation, or transportation facility of any kind" (*see McClure*, 305 N.W.2d at 766); nor as "any establishment or person," with the term "person" defined to include "one or more individuals, partnerships, associations, [or] organizations, . . . ." (*see Israel v. West Virginia Secondary Schools Activities Commission*, 182 W.Va. 454, 388 S.E.2d 480, 488 (1989) (distinguishing Title II)). Congress instead chose to highlight the concept of place by listing as examples establishments which possess concrete locations and facilities, and, in the particular provision at issue here, by rendering the statute applicable to "other places of . . . entertainment." 42 U.S.C. § 2000a(b)(3). *Cf. Hatheway v. Gannett Satellite Information Network, Inc.*, 157 Wis.2d 395, 459 N.W.2d 873 (Wis.App.1990) (newspaper which refused classified advertisement from gay/lesbian organization did not constitute a "public place of accommodation" within scope of Wisconsin accommodation statute, because newspaper was dissimilar to types of places listed in statute).[30]

The Boy Scouts, lacking a connection to a particular site or facility, does not qualify as such a place. Although both BSA and the Council may have certain administrative offices and do sponsor certain events at locations which might be thought of as places of public accommodations (*e.g.*, public campgrounds), access to these sites is not really at issue here. The dispute instead is one over access to the Boy Scouts as an *organization* and to the full range of its activities, many (if not most) of which do not take place at such locations. In and of themselves, neither the Council nor BSA constitute "places" within the meaning of Title II. Nor does the fact that the majority of scouting activities take place at some identifiable place in the generic sense—in a home, a church, a museum, or a Show Biz Pizza parlor, to cite but a few examples—render the Boy Scouts a "place" for purposes of Title II. Certain courts have sug-

---

**29.** In *Daniel,* the Supreme Court held that the Lake Nixon Club, an amusement park located near Little Rock, Arkansas, qualified as a "place of entertainment" under 42 U.S.C. § 2000a(b)(3). As the Fifth Circuit had in *Miller,* the Court rejected the Club's argument that it was unlike any of the other establishments listed in Subsection (b)(3) because it offered participatory, rather than spectator, amuse-

ment. 395 U.S. at 306–08, 89 S.Ct. at 1701–02. *See Miller,* 394 F.2d at 348–51.

**30.** *See generally United States v. Thomas,* 930 F.2d 526, 529 (7th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 171, 116 L.Ed.2d 134 (1991), and *Alschuler v. Department of Housing and Urban Development,* 686 F.2d 472, 488 (7th Cir.1982), employing similar *ejusdem generis* rationale.

gested otherwise. *See McClure*, 305 N.W.2d at 772 ("[i]f we were to look for mobile sites of the national organization's 'business facilities' we would find them in the sometimes door-to-door, company-to-company solicitation of members for the organization, and we would find them in the oft-shifted sites at which the affiliated local chapters hold meetings ..."); *see also Ridgewood Kiwanis Club*, 627 F.Supp. at 1387 ("[b]ecause Kiwanis conducts its meetings in just such places,—*i.e.*, public restaurants—[this] court concludes that the New Jersey Supreme Court would be prepared to find that the statutory 'place' requirement has been met ..."), *rejected*, 806 F.2d at 474. However, for the Court to deem the Boy Scouts a "place" simply because it conducts its activities at identifiable locations would attribute a sweeping scope to the term "place of public accommodation" completely inconsistent with its ordinary meaning. Private homes, for example, are rarely thought of as places of public accommodation (except perhaps by parents exasperated by the comings and goings of their prodigal adolescent offspring); and to use the family home as the site which triggers Title II coverage would raise serious constitutional concerns.

Lending further support to the conclusion that the Boy Scouts does not amount to a "place of public accommodation" within the scope of Title II is the fact that the primary benefits of membership in the organization flow not from access to or the use of a particular facility, but from the interaction and companionship amongst the boys and the adult volunteers. Organizations like the YMCA or Boys' Club, for example, have in common with the Boy Scouts the aim of fostering the mental, physical, and spiritual development of boys. Yet, unlike the Boy Scouts, the YMCA and Boys' Club work toward that goal in substantial part through a variety of programs and activities which center upon a concrete recreational facility embraced by the ordinary meaning of a "place of public accommodation" and a "place of entertainment" in particular. Having reviewed the body of evidence presented in this case, this Court is convinced that it would not particularly matter whether a Cub Scout den met in a club house, in a living room, or in a garage. The kinds of activities in which Boy Scout, Cub Scout, and Tiger Cub groups typically engage are not dependent upon the accoutrements of any particular location, let alone of a facility one would normally think of as a place of public accommodation. Rather, the success of the Boy Scouts, and the attraction to boys and their parents alike, lies in the sense of community among its participants.

In a similar vein, the Boy Scouts has argued that it does not qualify as a "place of entertainment," because the true sources of entertainment in the organization are its members and volunteers and the interaction between them, rather than any recreational equipment or other goods which have moved in interstate commerce. *See* 42 U.S.C. § 2000a(b) ("[e]ach of the following establishments which serves the public is a place of public accommodation within the meaning of this subchapter if its operations affect commerce ..."); 2000a(c) (a place of exhibition or entertainment under subsection (b)(3) affects commerce if "it customarily presents films, performances, athletic teams, exhibitions, or other sources of entertainment which move in commerce"). Because the Court concludes that the Boy Scouts does not constitute a "place of entertainment" as plaintiffs have contended, it need not and does not reach the question of whether the organization "customarily presents ... sources of entertainment which move in commerce." Thus, for example, the Court need not consider whether it is enough to satisfy the interstate commerce requirement of Title II that the Boy Scouts makes use of "fun books," uniforms, camping and hiking equipment, and other goods which may have moved in interstate commerce, even though these items may be incidental to the "entertainment" which the Boy Scouts offers. For present purposes, the Court merely notes its agreement with the proposition that the benefits of participation in the Boy Scouts stem not from access to particular places

or goods, but from the fellowship among Scouts and the adult volunteers.

In analytical terms, the Court also believes that excluding an organization like the Boy Scouts, whose activities and memberships lack a tie to the sorts of facilities cited in Title II as places of public accommodation, represents a prudent stopping point. For where the benefits of membership in an organization flow primarily, if not exclusively, from the interpersonal association among the people who belong to the organization rather than the enjoyment of the physical accoutrements of a particular facility, the rival interests implicated by exclusion of an individual from the group become more difficult to resolve. As set forth above, when Congress enacted Title II, it sought to ensure that everyone, regardless of their race, color, religion, or national origin, would have access to the public facilities which were necessary to everyday travel, sustenance, and recreation. Perhaps not so differently from the Boy Scouts today, some opponents of the act contended that integration of such public accommodations would interfere with their desire to associate with persons of their own choosing. *See, e.g.,* 110 Cong. Rec. 12700 (June 15, 1964) (remarks of Sen. Byrd) ("The right to exclusiveness, like the right to privacy, is essential to freedom, and no one is legally aggrieved by the exercise of that right."); *see also* Additional Views on H.R. 7152 of Hon. William M. McCulloch, et al., 88th Congress, 2d Sess. (1964), *reprinted in* 1964 U.S.C.C.A.N. 2487, 2495 (rejecting this line of argument). To whatever degree Congress might have found the assertion of such an interest to be valid, plainly it concluded that the interest in eradicating invidious discrimination in places of public accommodation outweighed any associational interest the owners and patrons of such establishments might assert. *See id.* However, there is no evidence that Congress struck the same balance vis a vis the membership organization which is divorced from any particular facility or location. In the context of such an organization, where the selection of one's companions is less fortuitous and (at least from the Boy Scouts' point of view)

depends to a significant degree upon the individual's affinity with the group's values and goals, the competing interests raise more nettlesome questions.

Of course, the Court is fully aware that Title II's private club exemption and the First Amendment defenses which are frequently raised in public accommodations cases supply a vehicle for resolution of these competing concerns. Indeed, the Boy Scouts has invoked these very defenses here, and the Court could and would reach them if it were necessary to do so. However, given the resolution of this case, the Court expresses no opinion on the merits of these defenses. The Court merely cites the clash between individual and associational rights which is highlighted in the context of this case—where the benefits of membership result exclusively from interpersonal relationships rather than the use of particular facilities—as yet another signal that entities like the Boy Scouts are almost certainly beyond the realm of establishments which Congress intended to reach through Title II.

The terms of Title II simply do not permit application of its provisions to membership organizations like the Boy Scouts, which do not operate a facility of the kinds referenced in the statute. Absent congressional action which would bring membership organizations *per se* within the scope of the federal public accommodations statute, the Boy Scouts may select its membership according to its own criteria and conscience.

## V. CONCLUSIONS OF LAW

1. The Court has jurisdiction over this case pursuant to 42 U.S.C. § 2000a-6 and 28 U.S.C. § 1331.

2. Title II of the Civil Rights Act of 1964, 42 U.S.C. § 2000a provides, in relevant part, as follows:

    (a) All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimi-

nation or segregation on the ground of race, color, religion, or national origin.

(b) Each of the following establishments which serves the public is a place of public accommodation within the meaning of this subchapter if its operations affect commerce, or if discrimination or segregation by it is supported by State action:

. . . . .

(3) any motion picture house, theater, concert hall, sports arena, stadium or other place of exhibition or entertainment; . . .

. . . .

(c) The operations of an establishment affect commerce within the meaning of this subchapter if . . . (3) in the case of an establishment described in paragraph (3) of subsection (b) of this section, it customarily presents films, performances, athletic teams, exhibitions, or other sources of entertainment which move in commerce; . . . . For purposes of this section, "commerce" means travel, trade, traffic, commerce, transportation, or communication among the several States, or between the District of Columbia and any State, or between any foreign country or any territory or possession and any State or the District of Columbia, or between points in the same State but through any other State or the District of Columbia or a foreign country.

. . . .

■ 3. In order to qualify as a "place of public accommodation" within the scope of Title II, an establishment must have a substantial connection to a concrete facility or location.

4. Membership organizations *per se,* which do not operate from or supply access to a particular facility or location, do not qualify as "places of public accommodation" within the meaning of Title II.

5. Defendants BSA and the Council constitute neither a "place of entertainment" nor any other kind of "place of public accommodation" within the scope of Title II, as they do not operate from or avail their members of access to a particular facility or location.

6. Accordingly, defendants are entitled to final judgment in their favor on both counts of plaintiffs' first amended complaint.

## VI.  CONCLUSION

For all of the reasons set forth above, upon review of the relevant authorities and the evidence presented at trial, the Court concludes that because defendants Boy Scouts of America and Boy Scouts of America West Suburban Council No. 147 do not operate from or provide access to particular locations or facilities, they do not qualify as "places of entertainment" or any other kind of "places of public accommodation" within the meaning of Title II of the Civil Rights Act of 1964, 42 U.S.C. § 2000a. Accordingly, the Court enters final judgment in favor of the defendants on both counts of plaintiffs' first amended complaint.